UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
MARIAN CARMELLINO, JOHN CASCIATO, JILL
GOLDBERG, ROBIN KESSLER, MARIE MAGALDI,
DEBORA MAUSKOPF, SARA LEE L. MELENDI,
C.H.E., EILEEN MILLARES, ARTHUR MILLER,
ELLEN O'LEARY, JOSEPHINE PASCUCCI,
BARBARA POCINO, VICTOR SANDS, DEBORAH
SCHWARTZ, MARSHA SILVERSTEIN, ALICE
STERNBERG, ELIZABETH DE MAIRO STINGO,
KATHERINE WEBER-WOLF, and MARY
YIALOURIS PAPASMIRIS,

                          Plaintiffs,                    03 Civ. 5942 (PKC)


            -against-                                    MEMORANDUM
                                                        AND ORDER

DISTRICT 20 OF THE NEW YORK CITY
DEPARTMENT OF EDUCATION, THE NEW YORK
CITY DEPARTMENT OF EDUCATION, VINCENT
GRIPPO, in his official capacity as Superintendent of
District 20 of the New York City Department of
Education, JOANN ASCUITTO, in her official capacity
as the Principal of Public School 180K, HOWARD
MEDNICK, Principal of Public School 180K, LOUISE
VERDEMARE, in her official capacity as the Principal
of Public School 112K, KATHLEEN LE DONNI, in her
official capacity as the Principal of Public School 247K,
MARGARET DE GAETA, in her official capacity as the
Principal of Public School 176K, ELIZABETH
CULKIN, in her official capacity as the Assistant
Principal and Acting Interim Principal of Public School
176K, PATRICK MARANO, in her official capacity as
the Principal of Public School 163K, JO N.
ROSSICONE, in her individual capacity as the Principal
of Intermediate School 220K, MARIE DI BELLA, in
her official capacity as the Principal of Public School 104K,
SYLVIA LA CERRA, in her official capacity as the
Principal of Public School 200K, THERESA DOVI, in
her official capacity as the Principal of Elementary
School 102K, and DIANE PICUCCI, in her official
capacity as the Principal of Public School 48K,

                          Defendants.

------------------------------------------------------------x

Table of Contents

I. Summary Judgment Standard .................................................................................. 2

II. Legal Standards: Discrimination and Retaliation Claims ..................................... 4

   A. Age Discrimination Under the ADEA ................................................................ 4

     1. First Prong: Within Protected Age Group ..................................................... 5

     2. Second Prong: Qualified for Position ............................................................ 5

     3. Third Prong: Adverse Employment Action ................................................... 5

     4. Fourth Prong: Inference of Discrimination ................................................... 8

     5. Legitimate, Nondiscriminatory Reasons ..................................................... 10

     6. Pretext ........................................................................................................... 10

     7. Statute of Limitations and the Continuing Violation Doctrine .................... 11

   B. Retaliation for Exercising ADEA-Based Rights .............................................. 13

     1. Protected Activity ......................................................................................... 14

     2. Materially Adverse Action ........................................................................... 14

     3. Causal Connection ........................................................................................ 16

III. Individual Claims ................................................................................................ 17

   A. Sara Lee Melendi ............................................................................................ 17

     1. Discrimination .............................................................................................. 20

     2. Retaliation .................................................................................................... 21

   B. Robin Kessler .................................................................................................. 23

     1. Discrimination .............................................................................................. 26

     2. Retaliation .................................................................................................... 30

   C. Eileen Millares ................................................................................................ 31

     1. Discrimination .............................................................................................. 36

     2. Retaliation .................................................................................................... 39

   D. Marsha Silverstein .......................................................................................... 40

     1. Discrimination .............................................................................................. 43

     2. Retaliation .................................................................................................... 49

   E. John Casciato .................................................................................................. 51

     1. Discrimination .............................................................................................. 52

     2. Retaliation .................................................................................................... 55

   F. Elizabeth DeMairo-Stingo and Mary Yialouris-Papasmiras ........................... 56

     1. Common Facts .............................................................................................. 56

     2. Elizabeth DeMairo-Stingo's Claims ............................................................ 60

       a. Discrimination ......................................................................................... 60

       b. Retaliation ............................................................................................... 63

     3. Mary Yialouris-Papasmiras' Claims ........................................................... 64

       a. Discrimination ......................................................................................... 64

       b. Retaliation ............................................................................................... 65

   G. Marie Magaldi ................................................................................................ 67

     1. Discrimination .............................................................................................. 67

     2. Retaliation .................................................................................................... 69

   H. Barbara Pocino ............................................................................................... 70

     1. Discrimination .............................................................................................. 73

     2. Retaliation .................................................................................................... 77

   I. Katherine Weber-Wolf .................................................................................... 79

     1. Discrimination .............................................................................................. 80

2. Retaliation ........................................................................................................ 82

J.  Ellen O'Leary ......................................................................................................... 83

1. Discrimination ................................................................................................. 84

b. Retaliation ...................................................................................................... 86

K.  Debora Mauskopf .................................................................................................. 87

1. Discrimination ................................................................................................. 89

2. Retaliation ...................................................................................................... 90

L.  Marian Carmellino .................................................................................................. 91

1. Discrimination ................................................................................................. 91

2. Retaliation ...................................................................................................... 94

IV.  False Arrest and Abuse of Process Claims of Victor Sands ............................................ 95

A.  Facts ..................................................................................................................... 95

B.  Discussion ............................................................................................................. 97

V.  Conclusion ...................................................................................................................... 100

P. KEVIN CASTEL, District Judge:

    The 14 remaining plaintiffs in this action are former or current teachers employed by the New York City Department of Education ("DOE"), all but one of whom complain of age discrimination in the workplace.  Although each plaintiff's factual allegations differ, the claims center upon the conduct of the Superintendent of District 20 of defendant DOE, Vincent Grippo, or a school principal within District 20.  Plaintiffs assert claims of age discrimination and unlawful retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, et seq.  One plaintiff, Victor Sands, does not assert claims of age discrimination or ADEA retaliation but asserts claims of false arrest and abuse of process.

    Plaintiffs filed their complaint on August 7, 2003.  (Docket No. 1)  The case was originally assigned to the Honorable Harold Baer, Jr., U.S.D.J., and reassigned to me on December 4, 2003.  (Docket Nos. 2, 12)  On April 6, 2004, I issued an order granting in part and denying in part defendants' motion for summary judgment.  See Carmellino v. District 20 of the N.Y. City Dep't of Educ., 2004 WL 736988 (S.D.N.Y. Apr. 6, 2004).[1]  In the April 6, 2004 Memorandum and Order, I granted summary judgment to defendants as to the claims of five plaintiffs: Jill Goldberg, Arthur Miller, Josephine Pascucci, Deborah Schwartz and Alice Sternberg.  Id.  Familiarity with this opinion is assumed.

    Discovery is closed, and defendants have moved for summary judgment on all of the remaining claims.  On June 30, 2006, I issued an Order seeking clarification as to whether defendants are moving for summary judgment on the ground that no reasonable jury could find the defendants' asserted nondiscriminatory reasons for the employer conduct at issue to be pretextual.  (Docket No. 77)  In addition, with regard to plaintiff Melendi's retaliation claim, the

---

[1] This order addressed a motion by defendants to dismiss the complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P., or, in the alternative, to grant summary judgment pursuant to Rule 56(b).  Carmellino, 2004 WL 736988, at *2.  I considered the motion as one for summary judgment because plaintiffs were on notice that summary judgment was possible, and plaintiffs responded to defendants' motion by submitting evidence to the Court.  Id.

Order directed the defendants to address whether they were moving for summary judgment on the ground that no reasonable jury could find that there existed a causal connection between Melendi's protected activity and the adverse employer conduct.  (<u>Id.</u>)  The Order also directed the parties to address the Supreme Court's recent decision in <u>Burlington N. & Santa Fe Ry. v. White</u>, 126 S. Ct. 2405 (2006).  (<u>Id.</u>)  Finally, I gave the plaintiffs an opportunity to make a further submission of evidence of the type contemplated by Rule 56(e), Fed. R. Civ. P.

In compliance with the June 30, 2006 Order, defendants submitted letters on July 14, 2006 ("Def. 7/14/06 Supp. Mem.") and July 21, 2006 ("Def. 7/21/06 Supp. Mem.").  (Docket No. 79)  Plaintiffs filed two memoranda with attached exhibits on July 17, 2006 ("Pl. 7/17/06 Supp. Mem.") and July 24, 2006 ("Pl. 7/24/06 Supp. Mem.").  (Docket Nos. 80-81)

For the reasons explained below, defendants' motion is denied as to the claims of plaintiff Melendi and otherwise granted.  In this Memorandum and Order, I will first set forth the applicable legal standards and then analyze each plaintiff's claims in the context of those standards insofar as a position is asserted in defendants' motion.

## I.    <u>Summary Judgment Standard</u>

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief.  A fact is material if it "might affect the outcome of the suit under the governing law . . ."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The evidence on each material element must be sufficient to entitle the movant

to relief in its favor as a matter of law.  Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373

F.3d 241, 244 (2d Cir. 2004).

When the moving party has met this initial burden and has asserted facts to

demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set

forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere

allegations or denials" of the facts asserted by the movant.  Fed. R. Civ. P. 56(e).  In order to

defeat summary judgment, the non-movant carries only "a limited burden of production," but

"must 'demonstrate more than some metaphysical doubt as to the material facts,' and come

forward with 'specific facts showing that there is a genuine issue for trial.'"  Powell v. Nat'l Bd.

of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslandis v. U.S. Lines, Inc., 477 U.S.

242, 252 (1986)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  The Court must "view

the evidence in the light most favorable to the non-moving party and draw all reasonable

inferences in its favor, and may grant summary judgment only when no reasonable trier of fact

could find in favor of the nonmoving party."  Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995)

(quotations and citations omitted); accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 587-88 (1986).  In reviewing a motion for summary judgment, the court must

scrutinize the record, and grant or deny summary judgment as the record warrants.  Fed. R. Civ.

P. 56(c).  In the absence of any disputed material fact, summary judgment is appropriate.  Id.

Mere "conclusory statements, conjecture, or speculation by the party resisting the motion will

not defeat summary judgment."  Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996)

(citing Matsushita Elec. Indus. Co., 475 U.S. at 587).  See also Anderson, 477 U.S. at 249-50

(noting that summary judgment should be granted if the evidence is "merely colorable" or "not

significantly probative").

Although discrimination and retaliation claims usually involve issues of intent, which are often ill-suited to resolution at the summary judgment stage, the Second Circuit has gone "out of [its] way to remind district courts that the 'impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable.'"  Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting McLee v. Chrysler Corp., 38 F.3d 67, 68 (2d Cir. 1994)), cert. denied, 540 U.S. 811 (2003).  See also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) ("[T]rial courts should not treat discrimination differently from other ultimate questions of fact." (internal quotations omitted)).


II.     Legal Standards: Discrimination and Retaliation Claims

I will first set forth certain background legal principles applicable to plaintiffs' age discrimination and retaliation claims.  Then, I will analyze plaintiffs' individual claims in the context of defendants' motion.


A.  Age Discrimination Under the ADEA

The Second Circuit recently restated its approach to ADEA discrimination claims in the context of summary judgment:

> To withstand a motion for summary judgment, a discrimination plaintiff must withstand the three-part burden-shifting laid out by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) 1973).  In a nutshell, a plaintiff first bears the minimal burden of setting out a *prima facie* discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination.

McPherson v. N.Y. City Dep't of Educ., 457 F.3d 211, 215 (2d Cir. 2006) (internal citations and quotations omitted).  A prima facie case of discrimination requires a plaintiff to show that: "1) he was within the protected age group; 2) he was qualified for the position; 3) he was subject to an

4

adverse employment action; and 4) the adverse action occurred under circumstances giving rise to an inference of discrimination."  Terry v. Ashcroft, 336 F.3d 128, 137-138 (2d Cir. 2003) (internal quotation omitted).  If the defendant comes forward with evidence of a legitimate, nondiscriminatory reason for the adverse employment action at issue, a plaintiff will not overcome a motion for summary judgment unless his or her "admissible evidence . . . show[s] circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."  Id. at 138.

### 1.  First Prong: Within Protected Age Group

The first prong of a prima facie case of discrimination under ADEA requires a plaintiff to demonstrate that he or she is in the protected age group.  29 U.S.C. § 631(a) (limiting the ADEA to individuals over the age of 40).  Defendants do not dispute that each  plaintiff claiming discrimination is over 40.

### 2.  Second Prong: Qualified for Position

The second prong of a prima facie case of discrimination under the ADEA requires that the employee be qualified for the position at issue.  Terry, 336 F.3d at 137-138. ADEA protects the rights of both employees and prospective employees, 29 U.S.C. § 623(a)(1), and the plaintiff need only show that he or she was minimally qualified for the position.  Owens v. N.Y. City Hous. Auth., 934 F.2d 405, 409 (2d Cir. 1991), cert. denied, 502 U.S. 964 (1991).

### 3.  Third Prong: Adverse Employment Action

As to the third prong, a plaintiff must demonstrate that he or she was subjected to adverse employment action, which, for purposes of a discrimination claim, is a "materially

adverse change in the terms and conditions of employment."  Fairbrother v. Morrison, 412 F.3d

39, 56 (2d Cir. 2005), abrogated on other grounds, Burlington Northern, 126 S. Ct. at 2405

(internal quotation omitted).  This change must be one that is "more disruptive than a mere

inconvenience or an alteration of job responsibilities." Galabya v. N.Y. City Bd. of Educ., 202

F.3d 636, 640 (2d Cir. 2000) (internal quotation omitted).  "Examples of materially adverse

changes include 'termination of employment, a demotion evidenced by a decrease in wage or

salary, a less distinguished title, a material loss of benefits, significantly diminished material

responsibilities, or other indices . . . unique to a particular situation.'"  Fairbrother, 412 F.3d at

56 (quoting Galabya, 202 F.3d at 640).  A decision not to promote an employee to an open and

available position for which the person has applied may constitute an adverse employment

action.  See Terry, 336 F.3d at 139.  However, a negative performance evaluation – without more

– does not ordinarily constitute an adverse employment action for purposes of a discrimination

claim.  See Weeks v. N.Y. State Div. of Parole, 273 F.3d 76, 86 (2d Cir. 2001), abrogated on

other grounds, Nat'l R.R. Passengers Corp. v. Morgan, 536 U.S. 101 (2002) ("It hardly needs

saying that criticism of an employee (which is part of training and necessary to allow employees

to develop, improve and avoid discipline) is not an adverse employment action.").

   Where a plaintiff claims that he or she was constructively discharged, "the

actionable conduct is not a discrete, identifiable act on the part of the defendant."  Flaherty v.

Metromail Corp., 235 F.3d 133, 138 (2d Cir. 2000).  "An employee is constructively discharged

when his employer, rather than discharging him directly, intentionally creates a work atmosphere

so intolerable that he is forced to quit involuntarily."  Terry, 336 F.3d at 151-152.  "[W]orking

conditions are intolerable when, viewed as a whole, they are so difficult or unpleasant that a

reasonable person in the employee's shoes would have felt compelled to resign."  Id. at 152

(internal quotation omitted).  See Pa. State Police v. Suders, 542 U.S. 129, 137 (2004) (noting

that the question of whether working conditions are intolerable is an objective inquiry).

These conditions often involve "pervasive, unabated harassment" by one's supervisors.  See, e.g., Terry, 336 F.3d at 152 (reversing district court's grant of summary judgment, in part, due to such comments, including "your days are numbered," plaintiff's "life's over with" and "you're going to be brought up on more charges").  However, a constructive discharge claim does not arise simply because an employee is dissatisfied with work assignments, feels that his or her work has been unfairly criticized or was subjected to unpleasant working conditions.  See Stetson v. Nynex Serv. Co., 995 F.2d 355, 361 (2d Cir. 1993); see also Martin v. Citibank, N.A., 762 F.2d 212, 221 (2d Cir. 1985) (affirming grant of motion for directed verdict on employee's constructive discharge claim under Title VII, despite evidence of supervisor's loud and unnecessary announcement to coworkers that the plaintiff had been polygraphed regarding missing money at another branch of the bank and unfounded complaints about the plaintiff's attitude).  Several courts have held that an employee is not constructively discharged when he or she resigns rather than respond to disciplinary charges.  See, e.g., Silverman v. New York, 216 F.Supp.2d 108, 115-16 (E.D.N.Y. 2002), aff'd, 64 Fed. Appx. 799 (2d Cir. 2003); Stembridge v. City of N.Y., 88 F.Supp.2d 276, 284-85 (S.D.N.Y. 2000), aff'd, 2000 U.S. App. LEXIS 38697 (2d Cir. Dec. 18, 2000).

In their July 24, 2006 supplemental memorandum opposing defendants' motion, plaintiffs appear to argue that Burlington N. & Santa Fe Ry. v. White, 126 S. Ct. 2405 (2006) (discussed below at I.B.2) altered not only the prima facie case of retaliation under Title VII, but the prima facie case of discrimination as well.  Specifically, plaintiffs argue that Burlington Northern broadened the definition of an "adverse employment action" for purposes of a Title VII or ADEA discrimination claim.  See, e.g., Pl. 7/21/06 Supp. Mem. at 4-7 (applying Burlington Northern to plaintiff Magaldi's allegations of age discrimination).  However, the Supreme Court explicitly restricted its holding to the retaliation provision of Title VII, which contains identical

7

relevant language to the retaliation provision in the ADEA.  See Burlington Northern, 126 S. Ct.

at 2410-14.  Specifically, the Court stated:

> . . . [T]he anti-retaliation provision, unlike the substantive provision, is not limited
> to discriminatory actions that affect the terms and conditions of employment.
>
> . . . [W]e do not accept the . . . view that it is "anomalous" to read the statute to
> provide broader protection for victims of retaliation than for those whom Title VII
> primarily seeks to protect, namely, victims of race-based, ethnic-based, religion-
> based, or gender-based discrimination.
>
> . . . Title VII's substantive provision and its anti-retaliation provision are not
> coterminous.  The scope of the anti-retaliation provision extends beyond
> workplace-related or employment-related retaliatory acts and harm.

Id. at 2412-14.  See also Kessler, 2006 WL 2424705, at *8-*9 (discussing such distinctions).  In

much of their supplemental briefing, plaintiffs erroneously apply Burlington Northern to both

discrimination and retaliation claims.  The rationale of Burlington Northern applies to the ADEA

retaliation claims, not the discrimination claims.


### 4.   Fourth Prong: Inference of Discrimination

The last prong of a prima facie case of age discrimination is that the plaintiff

suffered an adverse employment action under "circumstances giving rise to an inference of

discrimination."  Terry, 336 F.3d at 138.  "Direct evidence of discrimination is not necessary

because proof is seldom available with respect to an employer's mental processes.  Instead,

plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial

evidence . . . ."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000), cert. denied,

530 U.S. 1261 (2000) (internal citations omitted).  For example, the Supreme Court has held that

the fact that a plaintiff in an age discrimination case was replaced by someone "substantially

younger" is sufficient to satisfy this prong.  O'Connor v. Consol. Coin Caterers Corp., 517 U.S.

308, 313 (1996).  In the analogous context of a prima facie case of discrimination under Title

VII, the Second Circuit has provided a non-exclusive list of circumstances from which a

reasonable jury could infer discriminatory motive:

> Circumstances that give rise to an inference of discriminatory motive include
> actions or remarks made by decisionmakers that could be viewed as reflecting a
> discriminatory animus, preferential treatment given to employees outside the
> protected class, and, in a corporate downsizing, the systematic transfer of a
> discharged employee's duties to other employees, or a pattern of recommending
> the plaintiff for positions for which he or she is not qualified and failure to surface
> plaintiff's name for positions for which he or she is well-qualified.  A plaintiff
> might also rely upon the fact that the defendant, following plaintiff's termination,
> continued to seek applicants to fill the position, or, more generally, upon the
> timing or sequence of events leading to the plaintiff's termination.

Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996) (citations omitted).  If a

plaintiff asserts a claim of discrimination based upon a theory of constructive discharge, the

plaintiff must come forward with evidence that the discharge "occurred in circumstances giving

rise to an inference of discrimination on the basis of her membership in [a protected] class."  Id.

Relevant evidence for this prong includes an "employer's criticism of the

plaintiff's performance in ethnically degrading terms . . . or . . . invidious comments about others

in the employee's protected group."  Abdu-Brisson v. Delta Airlines, Inc., 239 F.3d 456, 468 (2d

Cir. 2001), cert. denied, 534 U.S. 993 (2001) (citations omitted).  However, a court may not –

without more – impute the bias of one supervisor to a different supervisor who was actually

responsible for the adverse employment action.  See McLee v. Chrysler Corp., 109 F.3d 130, 137

(2d Cir. 1997) (affirming summary judgment in favor of the employer on the ground that

plaintiff had failed to come forward with evidence to satisfy the fourth prong of a prima facie

case of discrimination).  Moreover, courts have generally held that a reasonable jury cannot infer

discrimination merely from "isolated and ambiguous" statements of an employer.  See, e.g.,

Pasha v. William M. Mercer Consulting, Inc., 2004 WL 188077, *5 (S.D.N.Y. Feb. 2, 2004),

aff'd, 135 Fed. Appx. 489 (2d Cir. 2005), cert. denied, 126 S.Ct. 1148 (2006); Douglas v. Dist.

Council 37 Mun. Emples. Educ. Fund Trust, 207 F.Supp.2d 282, 291 (S.D.N.Y. 2002).

### 5.   Legitimate, Nondiscriminatory Reasons

"[O]nce a plaintiff has established a prima facie case [of discrimination under the

ADEA], the burden shifts to the defendant, which is required to offer a legitimate, non-

discriminatory rationale for its actions." Terry, 336 F.3d at 138 (citing Schnabel v. Abramson,

232 F.3d 83, 87 (2d Cir. 2000)).  The Supreme Court has emphasized that the evidence produced

by the defendant need not be persuasive in order to rebut the legal presumption of discrimination

raised by the plaintiff's prima facie case. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509

(1993) ("By producing evidence (whether ultimately persuasive or not) of nondiscriminatory

reasons, petitioners sustained their burden of production, and thus placed themselves in a better

position than if they had remained silent.").  In addition, the Second Circuit has instructed that

the legitimacy of an employer's rationale for the adverse employment action at issue does not

depend on the reliability of the evidence supporting that rationale.  See McPherson, 457 F.3d at

216 ("In a discrimination case . . . , we are decidedly not interested in the truth of the allegations

against plaintiff.  We are interested in what *motivated* the employer [to engage in the adverse

employment action]; the factual validity of the underlying imputation against the employee is not

at issue." (emphasis in original)).  "'[T]he ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the

plaintiff.'"  St. Mary's Honor Ctr., 509 U.S. at 507 (quoting Tex. Dep't of Cmty. Affairs v.

Burdine, 460 U.S. 248, 253 (1981)).


### 6.   Pretext

"If the employer articulates a non-discriminatory reason for its employment

decision, the presumption of discrimination raised by the prima facie case 'simply drops out of

the picture.'"  Carlton, 202 F.3d at 134-135 (quoting St. Mary's Honor Ctr., 509 U.S. at 510-11).

"'[T]o defeat summary judgment . . . the plaintiff's admissible evidence must show

circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" Terry, 336 F.3d at 138 (quoting Stern, 131 F.3d at 312).

Such evidence may include the statements of a person involved in the adverse employment action at issue. See, e.g., Reeves, 530 U.S. at 151 (including, as permissible evidence of pretext, supervisor's comments to employee that employee "was so old [he] must have come over on the Mayflower" and that he "was too damn old to do [his] job"). However, "stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination." Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998) (citing Woroski v. Nashua Corp., 31 F.3d 105, 109-10 (2d Cir. 1994)). When such remarks are accompanied by "other indicia of discrimination," they can no longer be considered "stray" and thus may allow a reasonable jury to conclude that the employer's nondiscriminatory reasons are pretextual. Id. On a motion for summary judgment on an ADEA claim, the court must examine "the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." Schnabel, 232 F.3d at 90 (internal quotation omitted).

### 7.   Statute of Limitations and the Continuing Violation Doctrine

As I noted in my earlier opinion, Carmellino, 2004 WL 736988, at *11, the ADEA requires that a plaintiff asserting claims under the statute must first file a charge with the Equal Employment Opportunity Commission ("EEOC").  29 U.S.C. § 626(d).  Under this statutory scheme, a plaintiff in New York must file the EEOC charge within 300 days of the alleged discriminatory incident.  See Holowecki v. Fed. Express Corp., 440 F.3d 558, 562 & n.1 (2d Cir. 2006) (noting that the 300-day, instead of the alternative 60-day, limit applies because New York maintains an agency for remedying age discrimination claims and thus is a so-called

11

"deferral state").  In the context of Title VII, the Supreme Court has instructed that time limits for federal discrimination claims "are not to be disregarded by courts out of a vague sympathy for particular litigants."  Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 152 (1984).

The Supreme Court considered the application of the continuing violation doctrine to Title VII claims in Morgan, 536 U.S. at 113.  For the doctrine to apply, separate incidents must be part of one unlawful employment practice, such as the maintenance of a hostile work environment.  Id. at 114, 117.  Any acts that occur within the 300-day period preceding the plaintiff's filing of her EEOC charge will implicate related acts otherwise outside that period.  Id. at 117-18.

"To invoke the doctrine, a plaintiff must show either (1) 'specific ongoing discriminatory policies or practices,' or (2) 'specific and related instances of discrimination [that] are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.'"  Weeks, 273 F.3d at 82 (quoting Quinn v. Green Tree Credit Corp., 159 F.3d 759, 766 (2d Cir. 1998)).  See also Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993), cert. denied, 511 U.S. 1052 (1994) ("Multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation.").  Although the Supreme Court has not specified what practices other than the creation of a hostile work environment may constitute a continuing violation, it noted in Morgan that "termination, failure to promote, denial of transfer, [and] refusal to hire" were discrete acts not covered by the doctrine.  536 U.S. at 114.  See also Marinelli v. Chao, 222 F.Supp.2d 402, 413 (S.D.N.Y. 2002) (categorizing a "job transfer or discontinuance of a particular job assignment" as a discrete act to which the doctrine does not apply).  "[A] continuing violation cannot be established merely because the claimant continues to feel the effects of a time-barred discriminatory act.  Nor can an otherwise barred claim be rendered timely by the mere continuation of the claimant's employment."  Harris v. City of N.Y., 186 F.3d

243, 250 (2d Cir. 1999) (rejecting such arguments in the context of discrimination claims brought under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act and the Fourteenth Amendment).

A continuing violation must be "clearly asserted both in the EEOC filing and in the complaint." Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20, 25 (2d Cir. 1985), cert. denied, 474 U.S. 851 (1985). "As a general matter, the continuing violation doctrine 'is heavily disfavored in the Second Circuit' and courts have been 'loath' to apply it absent a showing of 'compelling circumstances.'" Trinidad v. N.Y. City Dep't of Corr., 423 F.Supp.2d 151, 165 n.11 (S.D.N.Y. 2006) (collecting cases). In all events, facts occurring outside the limitations period may be relevant as "background evidence" to claims arising within the limitations period. See Morgan, 536 U.S. at 101, 113. See also Jute v. Hamilton Sunstrand Corp., 420 F.3d 166, 176-77 (2d Cir. 2005) ("[R]elevant background evidence, such as statements by a decisionmaker or earlier decisions typifying the retaliation involved, may be considered to assess liability on the timely alleged act.").

B.  Retaliation for Exercising ADEA-Based Rights

All plaintiffs except, plaintiff Sands, assert claims of retaliation for their alleged exercise of rights protected by the ADEA. (Compl. ¶¶ 473-74) The ADEA prohibits an employer from retaliating against an employee for the mere exercise of such rights:

> It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this Act.

29 U.S.C. § 623(d).

The Second Circuit applies the McDonnell Douglas burden-shifting framework to claims of retaliation for the alleged exercise of ADEA-protected rights. Terry, 336 F.3d at 141.

Under this framework, a prima facie case of retaliation requires the plaintiff "to show '[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" Id. (quoting Quinn, 159 F.3d at 769). "[T]he burden of proof that must be met to establish a prima facie case is minimal." Schnabel, 232 F.3d at 87 (internal quotation omitted).

As with discrimination claims brought under the ADEA, an employer may rebut a prima facie case of retaliation based upon the exercise of ADEA-protected rights with evidence of a "legitimate, nondiscriminatory business reason" for its conduct. Id. If the employer offers such evidence, the employee has the burden of showing that such a rationale is pretextual and that his or her age was the real reason for the adverse employment action. Id.

### 1. Protected Activity

As to the first prong of a prima facie case, the plaintiff must show that he or she engaged in protected activity. One way in which an employee may engage in protected activity is to file a charge with the EEOC under the ADEA. 29 U.S.C. § 623(d) (prohibiting discrimination because an employee "has made a charge . . . under this Act"). Once an employee has filed a charge with the EEOC under the ADEA, statute requires the EEOC to "promptly notify all persons named in such charge as prospective defendants in the action . . . ." 29 U.S.C. § 626(d). All plaintiffs in this action asserting retaliation claims filed charges with the EEOC.

### 2. Materially Adverse Action

As part of the prima facie case, a plaintiff asserting a claim of retaliation under the ADEA must come forward with evidence of "an employment action disadvantaging the plaintiff." Terry, 336 F.3d at 141. The Supreme Court's recent ruling in Burlington Northern,

126 S. Ct. at 2405, construes the employer action requirement in the context of a retaliation

claim.  See Kessler v. Westchester County Dep't of Soc. Servs., 2006 WL 2424705, *8-*11 (2d

Cir. Aug. 23, 2006).  Although Burlington Northern only addressed the construction of the Title

VII retaliation provision, the standards used in the Second Circuit to analyze claims under that

provision apply equally to those under the ADEA retaliation provision.  Id. at *8; Terry, 336

F.3d at 141.

   In Burlington Northern, the Supreme Court resolved a split among the circuits

regarding what kind of employer conduct is required to establish a prima facie case of retaliation

under Title VII.  126 S. Ct. at 2410.  Previously, several circuits required a Title VII plaintiff to

show that he or she suffered an "adverse employment action," which the Second Circuit defined

as a "materially adverse change in the terms and conditions of employment."  Id. (collecting

cases).  See Sanders, 361 F.3d at 756 (requiring evidence of an "adverse employment action" to

support a retaliation claim under Title VII); Wanamaker v. Columbian Rope Co., 108 F.3d 462,

465-66 (2d Cir. 1997) (requiring an "adverse employment action" to support an ADEA

retaliation claim and holding that the denial of an office and telephone did not satisfy this

standard).

   Although the Court affirmed the Sixth Circuit in upholding the jury award for the

employee, it resolved the circuit split by adopting a more expansive interpretation of the

retaliation provision.  Id. at 2414.  Specifically, the Court held that a plaintiff asserting a

retaliation claim under Title VII now "must show that a reasonable employee would have found

the challenged action materially adverse, which in this context means it might well have

dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id. at

2415 (citations and quotations omitted).  The Court stated that this is an "objective standard" but

noted that "the significance of any given act of retaliation will often depend upon the particular

circumstances."  Id. ("Context matters.").

Since <u>Burlington Northern</u>, the Second Circuit has applied the decision to ADEA retaliation claims.  <u>See</u> <u>Kessler</u>, 2006 WL 2424705, at *8-*11.  In <u>Kessler</u>, the plaintiff had been employed as an Assistant Commissioner of a county government agency.  <u>Id.</u> at *1.  The court reversed a grant of summary judgment in favor of employer on the plaintiff's ADEA retaliation claim because the plaintiff had come forward with evidence from which a "rational factfinder could permissibly infer that a reasonable employee [in plaintiff's position] could well be dissuaded from making a charge of discrimination."  <u>Id.</u> at *11.  Specifically, the plaintiff had offered evidence that, after engaging in protected activity, he was transferred "to an office in which, <u>inter alia</u>, he would not be allowed to perform [his prior] broad discretionary and managerial functions . . ., no one would report to him, and he would be forced to do work normally performed by clerical and lower-level personnel."  <u>Id.</u>

### 3.  <u>Causal Connection</u>

"The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."  <u>Cifra v. Gen. Elec. Co.</u>, 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation omitted).  "In a causation analysis, the Court must look to when the defendant first became aware of the plaintiff's protected behavior."  <u>Hawana v. City of N.Y.</u>, 230 F.Supp.2d 518, 530 (S.D.N.Y. 2002) (citing <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001)).  In the context of First Amendment retaliation, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship . . . ."  <u>Gorman-Bakos v. Cornell Coop. Extension</u>, 252 F.3d 545, 554 (2d Cir. 2001).  <u>See also</u> <u>Clark County Sch. Dist.</u>, 532 U.S. at 273 (collecting cases in which three and four-month periods between the protected activity and the adverse action were insufficient to establish a causal connection).  "[W]here timing is the only basis for a claim of retaliation, and gradual adverse job

16

actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Slattery, 248 F.3d at 95. See, e.g., Phillips v. Mt. Sinai Med. Ctr., 2006 WL 177155, *1, *4 (S.D.N.Y. Jan. 24, 2006) (granting summary judgment to employer on retaliation claim where termination occurred three months after the filing of an EEOC charge and numerous disciplinary actions predated the filing).

III.   Individual Claims

Defendants do not dispute that, for the purpose of this motion, each plaintiff claiming discrimination is within the protected age group. Nor, except as to plaintiff John Casciato, do defendants dispute that each plaintiff was minimally qualified for the position he or she held. Defendants move for summary judgment on the grounds that each plaintiff has failed to satisfy the third and fourth prongs of a prima facie case of age discrimination – i.e., they argue that no plaintiff suffered an adverse employment action and that, in any event, the surrounding circumstances do not support an inference of discrimination. In addition, defendants offer legitimate, nondiscriminatory reasons for the alleged adverse employment actions as to each plaintiff. Finally, defendants argue that certain alleged employer actions are time-barred under the ADEA.

A.   Sara Lee Melendi

Plaintiff Sara Lee Melendi was born in 1947 and began teaching home economics at Intermediate School ("I.S.") 220 in 1988. (Def. Ex. Melendi A; Resp. to 56.1 ¶ 37) After observing one of plaintiff Melendi's classes on November 8, 2001, defendant Jo Rossicone – the Principal of I.S. 200 – wrote a detailed letter to Melendi in which she rated the lesson as unsatisfactory because the class was talking and no work was taking place. (Def. Ex. Melendi O; Resp. to 56.1 ¶ 49) On November 13, 2001, Assistant Principal Loretta Witek sat in on

17

Melendi's class and, in a letter to Melendi, reported that she had observed a "disruptive

situation" that she found to be an "unsafe environment for . . . students."  (Def. Ex. Melendi P;

Resp. to 56.1 ¶ 50)  On November 19, 2001, Witek again attended a class taught by Melendi and

reported that she had observed a disruptive environment.  (Def. Ex. Melendi Q; Resp. to 56.1 ¶

51)  Each of these letters to Melendi closed with the same sentence:

> You are hereby informed that this unsatisfactory performance may lead to
> additional disciplinary action including an unsatisfactory rating and disciplinary
> charges that can lead to your termination.

(Def. Exs. Melendi O, P, Q)  Witek recommended that Melendi visit other classrooms to observe

how other teachers maintain order and discipline.  (Def. Ex. Melendi Q)  Witek later gave

Melendi a schedule for observing other teachers.  (Def. Ex. Melendi R, Resp. to 56.1 ¶ 54)

On November 29, 2001, Assistant Principal Linda Alfred received a complaint

from an employee of the neighboring Maimonides Hospital.  (Def. Ex. Melendi S; Resp. to 56.1

¶ 52)  According to the employee, during plaintiff Melendi's class, students yelled profanities at

hospital employees from the classroom.  (Def. Ex. Melendi S)  Plaintiffs do not dispute that

Melendi explained to Alfred that she had rebuked the students for their conduct but that they

ignored her.  (Resp. to 56.1 ¶ 52)  Alfred wrote a letter to Melendi evaluating her conduct and

noting, in particular, her failure to inform the students' parents of their behavior.  (Def. Ex.

Melendi S)  This letter also warned Melendi that this "unsatisfactory performance" could lead to

"additional disciplinary charges," which might result in termination.  (Def. Ex. Melendi S)

On March 27, 2002, plaintiff Melendi was accused by one of her students of

having administered corporal punishment.  (Def. Ex. Melendi T; Resp. to 56.1 ¶ 55)  Assistant

Principal Witek investigated the incident by interviewing Melendi and witnesses to the incident.

(Def. Ex. Melendi T; Resp. to 56.1 ¶ 55)  After her investigation, Witek concluded that Melendi

had indeed pushed the student, thus violating school district regulations.  (Def. Ex. Melendi T;

Resp. to 56.1 ¶ 55)  Witek stated her findings in a letter to Melendi and warned her that "further

incidents like this may lead to additional disciplinary charges that can lead to your termination."
(Def. Ex. Melendi T)  Also on the date of this incident, plaintiff Melendi applied for a Study
Sabbatical for the 2002-2003 school year.  (Def. Ex. Melendi U; Resp. to 56.1 ¶ 56)  On April 8,
2002, defendant Rossicone approved Melendi's application.  (Def. Ex. Melendi U; Resp. to 56.1
¶ 56)

        In her affidavit and in her deposition, plaintiff Melendi has sworn that defendant
Rossicone made certain remarks during her employment in reference to Melendi's age.  At some
point in the fall of 2001, Rossicone allegedly told Melendi that she was "too old for the building"
and had "outlived [her] usefulness."  (Melendi Dep. at 153; Melendi Aff't ¶ 9)  In May of 2002,
Rossicone told Melendi that Melendi's salary could fund the combined salaries of two younger
teachers.  (Melendi Dep. at 127, 131; Melendi Aff't ¶¶ 5, 8)  On August 29, 2002, Melendi filed
a charge with the EEOC alleging age discrimination.  (Def. Ex. Melendi A; Resp. to 56.1 ¶ 57)

        On an undetermined date during the 2002-03 school year (and while plaintiff
Melendi was on sabbatical), defendant Rossicone decided to "excess" – i.e., eliminate – the
subject of home economics from the curriculum of I.S. 220.  (Rossicone Dep. at 158; Resp. to
56.1 ¶ 59)  I.S. 220 had not met standards in either math or literacy.  (Melendi Dep. at 130-31;
Rossicone Dep. at 158-59)  Rossicone testified that she cut the subjects of physical education,
health and home economics from the curriculum in order to bolster teaching in math and literacy.
(Rossicone Dep. at 158)  Rossicone informed Melendi, upon her return to I.S. 220 in September
2003, that her position had been excessed.  (Rossicone Dep. at 159)  Melendi testified that she
then worked in the main office of I.S. 220 for approximately the next five weeks doing what she
described as secretarial work – specifically, answering phones and filing paperwork.  (Melendi
Dep. at 166-67)  In October 2003, Melendi was transferred to another school where she has been
teaching to the present day.  (Def. Ex. Melendi C; Melendi Dep. at 167, 170; Resp. to 56.1 ¶ 60)

1.   <u>Discrimination</u>

Plaintiff Melendi swears that defendant Rossicone's threatened to give her a "U" rating for the 2001-02 academic year unless she went on sabbatical.  In her deposition, Melendi testified:

> [Rossicone] called me to her office and told me if you go on sabbatical, I will give you an S rating[.]  [I]f you stay here[,] I will give you a U rating and kill your teaching license.  She said, when you come back from sabbatical, I have made arrangements with Mr. Reiskin and Mr. Grippo to remove you from the building because you outlived your usefulness, and I can replace you with two baby teachers.

(Melendi Dep. at 126-27)  Plaintiffs contend that this coerced sabbatical amounted to adverse employment action.  (Pl. Mem. at 32)

The Second Circuit has emphasized that the question of whether a specific employment action is materially adverse for purposes of a discrimination claim under Title VII depends on what effect, if any, that action has on the terms and conditions of the plaintiff's employment.  <u>See</u> <u>Fairbrother</u>, 412 F.3d at 56.  Here, I conclude that there is a disputed issue of fact whether the alleged conditional and coercive threat to give Melendi U-rating if, but only if, she did not go on sabbatical amounted to adverse employment action.

There is an important distinction between the impact of the receipt of a U-rating (which, for the reasons discussed below at page 44, may not in some instances amount to adverse employment action) and a threat to have a teacher's rating for the past year turn on whether she agrees to refrain from teaching for the forthcoming year.  While on sabbatical, Melendi's job as a home economics teacher was "excessed".  The sabbatical and the "excessing" of the position could be viewed as two separate adverse employment actions or they could be viewed as one ongoing act.  (<u>See, e.g.</u>, Melendi Dep. at 127: ". . . when you come back from sabbatical, I have made arrangements . . . to remove you from the building . . . .").  Viewing the facts in a light

most favorable to Melendi, the trier of fact could view them as part of the same adverse employment action.

The timing of a sabbatical may have consequences to a teacher who is eligible to take it. It may prove more useful if it coincides with an educational or travel program in which the teacher desires to participate. It may be that a spouse would be able to join the teacher on sabbatical in one year but not in another. It is also true that a school may have legitimate needs in the timing of a sabbatical lest multiple teachers in the same discipline take their sabbaticals at the same time.

Plaintiff Melendi has made out a prima facie case of discrimination. She was within the protected age category and possessed the requisite minimal qualifications to serve in her teaching position. The coercive (and successful) effort to obtain Melendi's consent to an immediate sabbatical with the evaluative rating for the period already worked hanging in the balance presents, at minimum, a triable issue of fact as to whether it amounts to adverse employment action. The hotly disputed comments regarding age included those directly related to Melandi's own continued employment (see, e.g., Melendi Dep. at 127: ". . . I can replace you with two baby teachers."), if believed, are sufficient to raise an inference of discrimination. Because defendants vehemently deny the threats and the age-related comments, they have not endeavored to offer a legitimate non-discriminatory reason for defendants' actions with respect to the sabbatical beyond the disputed claim that it was a voluntary decision of Melendi.

Viewing the facts in a light most favorable to Melendi, summary judgment is denied to defendants on plaintiff Melendi's claim of age discrimination under the ADEA.

2. Retaliation

Melendi filed her charge with the EEOC on August 29, 2002. (Def. Ex. Melendi A; Resp. to 56.1 ¶ 57) Plaintiffs assert that the decision to eliminate home economics as a course

meant that plaintiff Melendi "was forced to find employment elsewhere" and this amounted to adverse employment action taken because she filed a complaint with the EEOC.  (Pl. Mem. at 32)

As discussed above, the Supreme Court recently held that a prima facie case of retaliation "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington Northern, 126 S. Ct. at 2415 (internal quotations omitted).  Viewing the facts in the light most favorable to plaintiffs, there is a triable issue of fact as to whether plaintiff Melendi experienced materially adverse employer action after filing her EEOC charge.  It is undisputed that plaintiff Melendi taught home economics and that defendant Rossicone eliminated this class from the school's curriculum during the 2002-03 school year.  (Rossicone Dep. at 158; Resp. to 56.1 ¶ 59)  As a result, when plaintiff Melendi returned from her sabbatical in September 2003, there was no longer any subject for her to teach.  Defendant DOE eventually arranged a transfer for plaintiff Melendi (Melendi Dep. at 167, 170), but plaintiffs have come forward with evidence that, in the meantime, her job consisted largely of answering phones and paperwork.  (Melendi Dep. at 166-67)  A reasonable jury could conclude that the decision to "excess" plaintiff Melendi's course – thereby requiring plaintiff Melendi to do what amounted to secretarial work, albeit temporarily, and later to transfer to another school – meets the Burlington Northern standard of adverse employer action.  Plaintiffs have established a prima facie case of retaliation under the ADEA.

Defendants have come forward with evidence of their legitimate, nondiscriminatory reasons for the alleged adverse conduct.  As discussed above, defendant Rossicone testified that she decided to "excess" home economics because I.S. 220 had not met standards in math and literacy.  (Melendi Dep. at 130-31; Rossicone Dep. at 158)  Defendant Rossicone testified that she also cut the subjects of physical education, health and home

economics from the curriculum in order to bolster teaching in math and literacy.  (Rossicone Dep. at 158)  When the decision to eliminate the course in home economics is viewed in isolation as a separate, post-protected activity, adverse employer action, defendants have met their burden of coming forward with a legitimate, nondiscriminatory reason for their action.

I view it as a close question whether plaintiffs have come forward with evidence sufficient to raise a triable issue of fact as to the legitimate, nondiscriminatory reason proffered by defendants for the elimination of the position.  Plaintiffs appear to rely on the fact that health education and physical education (but not home economics) are mandatory parts of the school curriculum.  This appears to be somewhat of a non-sequitur in relation to the decision to eliminate home economics.  Nevertheless, given the sequence of events – the alleged coercion in connection with the sabbatical that took place prior to the EEOC filing, the EEOC filing in August 2002, and the elimination of the position on the heels of Melendi's September 2003 return from sabbatical – I will deny summary judgment on the retaliation claim and allow the issue to go to the jury.

Summary judgment is denied to defendants on plaintiff Melendi's claim of unlawful retaliation under the ADEA.


B.  Robin Kessler

Plaintiff Robin Kessler was born in 1955.  (Def. Ex. Kessler A; Resp. to 56.1 ¶ 61)  She began teaching at P.S. 247 in February 1991 and remained employed at that location during the relevant period.  (Def. Ex. Kessler A; Resp. to 56.1 ¶ 61)

On January 31, 2002, plaintiff Kessler was walking her class down a flight of stairs to the school lunch room at P.S. 247.  (Def. Ex. Kessler C; Resp. to 56.1 ¶ 62)  According to a subsequent investigation report by the school district, a student from another class was walking down the stairs ahead of them.  (Def. Ex. Kessler C; Resp. to 56.1 ¶ 62)  This student

suffered from weight and respiratory problems and was walking more slowly than other students. (Def. Ex. Kessler C; Resp. to 56.1 ¶ 62)  In her deposition, Kessler described the student as "struggling very badly" at that time.  (Kessler Dep. at 24)  The investigation report states that Kessler became impatient with the student and yelled at her and her teacher.  (Def. Ex. Kessler C; Resp. to 56.1 ¶ 62)  The report states that Kessler then grabbed the student's ankles to demonstrate how the student should walk more quickly (Def. Ex. Kessler C; Resp. to 56.1 ¶ 62); Kessler contends that she merely tapped the student's foot (Kessler Dep. at 25).  The student began to cry, lost her balance and fell down the stairs.  (Def. Ex. Kessler C; Resp. to 56.1 ¶ 62)

On February 1, 2002, the parent of the student contacted defendant Kathleen Le Donni, the Principal of P.S. 247, to complain about plaintiff Kessler.  (Def. Ex. Kessler C; Resp. to 56.1 ¶ 63)  It is undisputed that school district regulations require the principal in such a situation to contact the Office of Special Investigations ("OSI") for defendant DOE.  (Def. Ex. Kessler C; Resp. to 56.1 ¶ 63)  The OSI investigation included interviews of Le Donni, teacher Jennifer DeLessio and the student.  (Def. Ex. Kessler C; Resp. to 56.1 ¶ 64)  Investigators requested an interview with Kessler, but she refused.  (Def. Ex. Kessler C; Resp. to 56.1 ¶¶ 64, 66)

On April 1, 2002, OSI concluded that plaintiff Kessler did, in fact, commit an act of corporal punishment against the student in question on January 31, 2002.  (Def. Ex. Kessler C; Resp. to 56.1 ¶ 67)  The matter was then forwarded to the Office of Legal Services ("OLS") to determine whether a Technical Assistance Conference should be held.  (Def. Ex. Kessler C; Resp. to 56.1 ¶ 67)  Plaintiffs dispute the findings of this investigation on the grounds that OSI failed to interview Ivy Bursic, a teacher's aide that plaintiffs claim was the "only adult witness present when the alleged incident occurred."  (Kessler Dep. at 25-26; Resp. to 56.1 ¶¶ 62, 67)

On May 13, 2002, defendant Vincent Grippo wrote to plaintiff Kessler to schedule a meeting to address the corporal punishment charge brought against her.  (Def. Ex.

Kessler F; Resp. to 56.1 ¶ 68)  Kessler then met with Grippo and Marvin Reiskin, plaintiff

Kessler's representative from the United Federation of Teachers ("UFT").  (Def. Ex. Kessler G;

Kessler Dep. at 47; Resp. to 56.1 ¶ 69)  At this meeting, plaintiff Kessler reported that, on the

advice of her attorney, she denied the charges against her and declined to give further

explanation.  (Def. Ex. Kessler G; Kessler Dep. at 48-49; Resp. to 56.1 ¶ 70)  On June 7, 2002,

Grippo sent Kessler a letter in which he informed her that he was adopting the findings in the

OSI report.  (Def. Ex. Kessler H; Resp. to 56.1 ¶ 71)  On June 21, 2002, Kessler received a "U"

rating for her annual performance evaluation.  (Def. Ex. Kessler I; Resp. to 56.1 ¶ 72)

   Thereafter, on August 29, 2002, plaintiff Kessler filed an EEOC age

discrimination charge against the DOE.  (Def. Ex. Kessler A; Resp. to 56.1 ¶ 73)  On October 1,

2002, defendant Grippo sent Kessler a letter informing her that she was being charged with

misconduct for an incident during the preceding school year under Education Law 3020-a.  (Def.

Ex. Kessler K; Resp. to 56.1 ¶ 75)

   Through her counsel, plaintiff Kessler and the DOE negotiated an agreement to

settle the charges against her.  (Kessler Dep. at 54)  On November 20, 2002, a DOE attorney

faxed a draft of the settlement agreement to plaintiff Kessler's attorney.  (Def. Ex. Kessler L;

Resp. to 56.1 ¶ 77)  Kessler's attorney acknowledged receipt of the draft agreement and

responded with proposed changes.  (Def. Ex. Kessler M, Resp. to 56.1 ¶ 77)  On November 21,

2002, the DOE forwarded a revised version of the agreement to Kessler's attorney.  (Resp. to

56.1 ¶ 78)  On November 26, 2002, Kessler and her attorney signed a post-charge stipulation and

a letter of irrevocable resignation, effective December 1, 2002.  (Def. Ex. Kessler N, Resp. to

56.1 ¶ 79)

1.  <u>Discrimination</u>

In moving for summary judgment, defendants argue that plaintiff Kessler's written agreement with the DOE precludes her claim of discrimination.  (Def. Mem. at 12-14)  In opposing summary judgment, plaintiffs argue that the purported waiver of claims fails to satisfy the requirements of the Older Worker Benefits Protection Act ("OWBPA"), 29 U.S.C. § 626(f).  (Pl. Mem. at 17-18)

"The OWBPA sets up its own regime for assessing the effect of ADEA waivers, separate and apart from contract law."  <u>Oubre v. Entergy Operations, Inc.</u>, 522 U.S. 422, 427 (1998).  "[I]n settlements of ADEA-EEOC charges or lawsuits, [a waiver] 'may not be considered knowing and voluntary unless at a minimum' the first five factors listed in Section 626(f)(1) are met and the employee 'is given a reasonable period of time within which to consider the settlement agreement.'  <u>Hodge v. N.Y. Coll. of Podiatric Med.</u>, 157 F.3d 164, 166 (2d Cir. 1998) (quoting 29 U.S.C. §§ 626(f)(1)(A)-(E), (f)(2)).  Those five factors in section 626(f)(1) are:

> (A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;
>
> (B) the waiver specifically refers to rights or claims arising under this Act;
>
> (C) the individual does not waive rights or claims that may arise after the date the waiver is executed;
>
> (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;
>
> (E) the individual is advised in writing to consult with an attorney prior to executing the agreement.

29 U.S.C. § 626(f)(1).  In <u>Oubre</u>, the Supreme Court held that a purported waiver must comply with the "stringent safeguards" of section 626(f) in order to be effective.  522 U.S. at 427-28 (considering whether a pre-dispute waiver complied with such safeguards).  Moreover, "the party

asserting the validity of a waiver shall have the burden of proving in a court of competent

jurisdiction that a waiver was knowing and voluntary . . . ."  29 U.S.C. § 626(f)(3).

It is undisputed that, on November 22, 2002, plaintiff Kessler signed an

agreement with defendant DOE to resign from her position, effective December 1, 2002.  (Def.

Ex. Kessler N, Resp. to 56.1 ¶ 79)  Regarding the then-pending charge before the EEOC, the

agreement provides, in relevant part, as follows:

> The parties to this Stipulation of Settlement knowingly waive their rights to make
> any legal, contractual or equitable claims or to initiate legal proceedings of any
> kind against each other or any employee thereof, relating to or arising out of this
> disciplinary matter, including claims for costs, expenses and attorney's fees,
> except to enforce this Stipulation of Settlement.  Respondent [Robin Kessler]
> further agrees to withdraw any such claims or actions that already may have been
> commenced in any forum whatsoever, specifically the EEOC claim filed on or
> about August 29, 2002 under charge number 160A202016 and agrees to withdraw
> said action within fifteen (15) days of the execution of this stipulation.
> Respondent [Kessler] further agrees not to file [a complaint in any] forum
> whatsoever in the future arising out of the facts and circumstances of this case."

(Def. Ex. Kessler O ¶ 12)

Paragraph 12 of the settlement agreement between plaintiff Kessler and defendant

DOE meets all of the statutory requirements to constitute an effective waiver of her ADEA

claims.  To satisfy the first requirement, an agreement purporting to release ADEA claims must

be written clearly and in plain language.  In opposing defendants' motion, Kessler has not come

forward with an affidavit claiming that she did not understand the language in the settlement

agreement.  Having examined the language myself, I conclude that it is written in a clear and

plain manner readily capable of being understood.  See, e.g., Bachiller v. Turn On Prods., Inc.,

2003 WL 1878416, *4 (S.D.N.Y. Apr. 14, 2003), aff'd, 86 Fed.Appx. 465 (granting summary

judgment on ADEA claims because the language of the release "clearly and plainly inform[ed]

Plaintiff that if she signs the Release, she will be barred from bringing any claim against

Defendants based on the conditions or termination of her employment").  In addition, a

plaintiff's education and work experience may weigh in favor of concluding that plaintiff

27

understood the agreement.  See, e.g., Hseuh v. Bank of N.Y., 2005 WL 2842069, *4 (S.D.N.Y.

Oct. 31, 2005) (considering, inter alia, plaintiff's education and ten years of business experience

in concluding that plaintiff understood the ADEA release); Bachiller, 2003 WL 1878416, at *4

(concluding that plaintiff was "capable of understanding" the ADEA release because she had a

high school equivalency diploma and worked as an accounts payable clerk at the time she signed

it).  Here, plaintiff Kessler likely has a better understanding of English than the "average

individual" of section 626(f)(1)(A) because she has a master's degree in education.  (Def. Ex.

Kessler G; Kessler Dep. at 8)  Taking account of all evidence of record, I conclude that the

release satisfies the first requirement of section 626(f).

       Second, the agreement refers specifically to the claims that plaintiff filed with the

EEOC asserting age discrimination.  (Def. Ex. Kessler O ¶ 12)  Indeed, Paragraph 12 identifies

these claims by the charge number and the date on which her charge was filed with the EEOC.

(Id.)  Third, the language of the agreement restricts the waiver only to claims that had arisen "out

of the facts and circumstances of this case."  (Id.)  The agreement does not bar plaintiff from

asserting claims against defendants that might arise after November 22, 2002.  Plaintiffs do not

argue that any portion of any claim pertaining to plaintiff Kessler arose after that date.  (Pl. Mem.

at 17-21)

       The agreement meets the fourth and fifth requirements of section 626(f) as well.

The second paragraph of the agreement provides, "[i]n consideration of the above, the

Superintendent of CSD #20 agrees to withdraw the charges, with prejudice, that were voted on or

about October 1, 2002."  (Def. Ex. Kessler O ¶ 2)  This promise constitutes adequate

consideration for plaintiff Kessler's promise to withdraw her EEOC charge and any related

claims because, as required by section 626(f)(1), it was not something to which Kessler was

already entitled.  Fifth, the agreement itself advises Kessler to consult with an attorney and states

that she has done so:

6.  ROBIN KESSLER affirms that she has had access to counsel in reaching this agreement and has consulted with counsel regarding the terms of this Stipulation of Settlement and has entered into this agreement with advice and consent.

(Def. Ex. Kessler O ¶ 6)  In addition, Kessler's attorney signed the document.  (Def. Ex. Kessler O)

With regard to the last requirement of section 626(f), "Congress did not specify how a court should determine what constitutes a 'reasonable period of time.'"  Manning v. N.Y. Univ., 2001 WL 963982, *7 (S.D.N.Y. Aug. 22, 2001), aff'd, 299 F.3d 156, cert. denied, 538 U.S. 1035 (quoting 29 U.S.C. § 626(f)(2)(B)).  The Federal Regulations promulgated under section 626(f) simply state that "the term 'reasonable time within which to consider the settlement agreement' means reasonable under all the circumstances, including whether the individual is represented by counsel."  29 C.F.R. § 1625.22(g)(4).  In Manning, Judge Buchwald observed that courts must engage in case-specific analysis of whether a plaintiff had a "reasonable time" to consider an agreement.  2001 WL 963982, at *7 (noting that "[h]ad Congress wished courts to apply a specific set of standards, it would have enumerated them" as it did in section 626(f)(1)(F)-(H) for waivers signed outside of lawsuits and EEOC proceedings ).

In this case, plaintiff Kessler and her attorney actively negotiated the settlement agreement, a draft of which they received on November 20, 2002.  (Def. Ex. Kessler L; Resp. to 56.1 ¶ 77)  The next day, plaintiff Kessler's attorney proposed several changes to the agreement, and the DOE then modified the draft document.  (Def. Exs. Kessler M, O; Resp to 56.1 ¶¶ 77, 78)  Five days after receiving the final version of the agreement, plaintiff Kessler's attorney returned to defendant DOE the agreement with his and plaintiff Kessler's signatures.  (Def. Ex. Kessler N; Resp. to 56.1 ¶ 79)  On these facts, no reasonable fact finder could conclude that Kessler or her attorney had insufficient time to review the settlement agreement, and therefore the document operates as a valid waiver of plaintiff Kessler's EEOC charge.

Summary judgment is granted to defendants on plaintiff Kessler's claim of age discrimination under the ADEA.

2.  Retaliation

Plaintiff Kessler's retaliation claim is premised upon the fact that defendants initiated formal disciplinary charges against Kessler approximately one month after she filed her EEOC charge.  (Pl. 7/24/06 Supp. Mem. at 22-23)  Among other reasons, defendants move for summary judgment on the ground that plaintiff Kessler has not come forward with evidence of a causal relationship between her protected activity and adverse employer conduct.  (Def. Mem. at 16)

To establish a causal relationship between protected activity and adverse employer conduct, a plaintiff must, at a minimum, introduce evidence that the protected activity in question occurred before the adverse employment action.  See, e.g., Buompane v. Citibank, N.A., 2002 WL 603036, *15-*16 (S.D.N.Y. Apr. 18, 2002) (granting summary judgment to employer where request for employee's termination predated his protected activity by six weeks).  Where there is evidence that the employer was considering the adverse employment action before any protected activity, the Supreme Court has held that an employer's "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."  Clark County Sch. Dist., 532 U.S. at 272 (addressing the causation prong in the analogous context of Title VII retaliation claims).

Here, there is no evidence that plaintiff Kessler engaged in any protected activity other than the filing of an EEOC charge on August 29, 2002.  (Def. Ex. Kessler A; Resp. to 56.1 ¶ 73)  Defendant DOE's misconduct charge against Kessler, of which she was informed on October 1, 2002, was the culmination of an internal investigation that began as early as February 1, 2002.  (Def. Ex. Kessler C; Resp. to 56.1 ¶ 63)  On April 1, 2002, OSI concluded that Kessler

30

had, in fact, committed an act of corporal punishment against a student (Def. Ex. Kessler C; Resp. to 56.1 ¶ 67), and OSI then forwarded the matter on to the defendant DOE's Office of Legal Services.  (Def. Ex. Kessler C; Resp. to 56.1 ¶ 67)  Plaintiffs concede in a supplemental memorandum that Kessler did not file her EEOC charge until after the charges were "preferred" against her.  See Pl. 7/24/06 Supp. Mem. at 24 ("Once the charges were preferred . . ., Ms. Kessler filed an EEOC Charge . . . .").  Furthermore, Kessler testified in her deposition that she was aware that disciplinary charges were pending against her when she filed her EEOC charge. (Kessler Dep. at 51)  There is no other evidence in the record relating to when defendant Grippo or any other official actually decided that the DOE would formally charge Kessler.  Therefore, the only available evidence indicates that Kessler knew that such charges would be brought against her on August 29, 2002.  Based upon the evidence in the record, no reasonable jury could conclude that Kessler's EEOC charge caused the DOE to file these charges, and thus plaintiff Kessler cannot make out a prima facie case of ADEA retaliation.

Summary judgment is granted to defendants on plaintiff Kessler's claim of retaliation under the ADEA.


C.  Eileen Millares

Plaintiff Eileen Millares was born in 1942.  (Def. Ex. Millares A; Resp. to 56.1 ¶ 82)  Millares began working as a teacher for defendant DOE in 1986.  (Def. Ex. Millares B; Resp. to 56.1 ¶ 82)  During the relevant period, Millares was employed at P.S. 247.  (Def. Ex. Millares B; Resp. to 56.1 ¶ 82)

On March 16, 1999, plaintiff Millares administered a standardized examination to her students, and Assistant Principal Bonnie Ferretti claims to have observed Millares helping her students with some answers.  (Def. Ex. Millares D; Resp. to 56.1 ¶ 84)  In investigating the matter, Assistant Principal Ferretti heard from several students that Millares had indeed assisted

them in taking the examination.  (Def. Ex. Millares D; Resp. to 56.1 ¶ 84)  On March 30, 1999,

defendant Le Donni wrote to Millares to direct her to review the examination procedures booklet

and not to improperly assist students in taking an examination.  (Def. Ex. Millares D; Resp. to

56.1 ¶ 84)  Le Donni noted that she had reported the matter to the school district, and the school

was now required to have a proctor observe Millares's administration of a later examination.

(Def. Ex. Millares D; Resp. to 56.1 ¶ 84)  Despite this incident, Millares received a satisfactory

evaluation in her annual performance review at the end of the 1998-1999 school year.  (Def. Ex.

Millares E; Resp. to 56.1 ¶ 85)

       On October 8, 1999, Principal Le Donni observed plaintiff Millares teaching a

class.  (Def. Ex. Millares G; Resp. to 56.1 ¶ 86)  Le Donni wrote to Millares to provide a critique

of Millares's performance.  (Def. Ex. Millares G; Resp. to 56.1 ¶ 86)  Specifically, Le Donni

wrote that "students were not engaged in any activity," there was "incorrect grammar on the

board," and "no reference was ever made to the aim of the lesson."  (Def. Ex. Millares G; Resp.

to 56.1 ¶ 86)  Le Donni characterized Millares's lesson plans as "inadequate" and the observed

lesson as "unsatisfactory" and noted that a copy of the letter would be placed in Millares's file.

(Def. Ex. Millares G; Resp. to 56.1 ¶ 86)  In addition, Millares agreed to supply Le Donni with

her lesson plans each Monday.  (Def. Ex. Millares G; Resp. to 56.1 ¶ 86)

       On December 20, 1999, defendant Le Donni observed another class of plaintiff

Millares and again rated the lesson as "unsatisfactory".  (Def. Ex. Millares H; Resp. to 56.1 ¶ 87)

In a letter to Millares, Le Donni wrote that "students had nothing but notebooks on their desks"

and "[t]here was no motivation, no activity for the students."  (Def. Ex. Millares H; Resp. to 56.1

¶ 87)  Le Donni also noted that Millares had not submitted her lesson plans on Mondays, as

previously agreed.  (Def. Ex. Millares H; Resp. to 56.1 ¶ 87)

       On March 14, 2000, plaintiff Millares applied for a sabbatical.  (Def. Ex. Millares

I; Resp. to 56.1 ¶ 88)  The application stated that Millares was seeking leave for September 2000

to June 2001 and that the purpose of the sabbatical was designated as "Study".  (Def. Ex.

Millares I; Resp. to 56.1 ¶ 88)  On March 15, 2000, Le Donni approved Millares's application

for leave.

On March 21, 2000, defendant Le Donni observed plaintiff Millares teaching a

class.  (Def. Ex. Millares J; Resp. to 56.1 ¶ 89)  In a letter to Millares, Le Donni stated that,

despite her previous evaluations, the lesson plan did not include "a motivation, an aim, a

developmental procedure, use of materials, an activity, [or] a follow up assignment."  (Def. Ex.

Millares J; Resp. to 56.1 ¶ 89)  Le Donni noted that Millares had received assistance from a

district staff developer and suggested that Millares seek the assistance of Assistant Principal

Michelle Fuerst.  (Def. Ex. Millares J; Resp. to 56.1 ¶ 89)  On March 27, 2000, Le Donni again

conducted an observation of Millares's teaching and wrote a negative evaluation because, in

teaching a lesson on capitalization, Millares incorrectly capitalized two words on the board.

(Def. Ex. Millares K; Resp. to 56.1 ¶ 90)

On May 15, 2000, defendant Le Donni noticed that plaintiff Millares had not

arrived when the 8:40 a.m. school bell rang and that Millares's students were lined up,

unattended, outside their classroom.  (Def. Ex. Millares M; Resp. to 56.1 ¶ 92)  Millares arrived

a few minutes later, and Le Donni wrote to her stating that "leaving a class unsupervised poses a

serious threat to the safety and welfare of students."  (Def. Ex. Millares M; Resp. to 56.1 ¶ 92)

On May 31, 2000, Assistant Principal Fuerst observed plaintiff Millares's

teaching and noted, in a letter to Millares, her use of incorrect terms, meanings and incomplete

sentences.  (Def. Ex. Millares N; Resp. to 56.1 ¶ 93)  Fuerst noted two instances in which

students misread words and Millares failed to correct them.  (Def. Ex. Millares N; Resp. to 56.1 ¶

93)  In addition, Fuerst stated that the homework assignment did not support the learning

activities that took place in class.  (Def. Ex. Millares N; Resp. to 56.1 ¶ 93)  On that day, Le

Donni observed Millares's leading her class to another part of the building and neglecting to

notice that two students lagged behind.  (Def. Ex. Millares O, Resp. to 56.1 ¶ 94)  Le Donni

wrote a letter to Millares about the incident in which she stated that such neglect "jeopardizes the

students' safety and poses a serious danger to their welfare."  (Def. Ex. Millares O, Resp. to 56.1

¶ 94)

On June 19, 2000, plaintiff Millares received an unsatisfactory rating for the

1999-2000 school year.  (Def. Ex. Millares P; Resp. to 56.1 ¶ 95)  During the following school

year, Millares was on sabbatical, per Le Donni's approval of her request.  In September 2001,

Millares returned to P.S. 247.  (Millares Dep. at 32-33)

On November 9, 2001, Assistant Principal Lillian Catalano found plaintiff

Millares eating in the lunchroom during a class period that she was scheduled to cover.  (Def. Ex.

Millares R; Resp. to 56.1 ¶ 98)  Defendant Le Donni wrote to Millares about the incident, noting

that this was the second time that she had forgotten to cover a scheduled class and was late.

(Def. Ex. Millares R; Resp. to 56.1 ¶ 98)

On November 26, 2001, defendant Le Donni wrote to plaintiff Millares directing

her to submit her lesson plans for the coming week so that Le Donni could confirm that they

contained necessary components, including "aim, motivation, materials, procedure/ assignment,

evaluation and summary."  (Def. Ex. Millares S; Resp. to 56.1 ¶ 99)  In the letter, Le Donni

invited Millares to bring a union representative with her to a meeting with Le Donni.  (Def. Ex.

Millares S; Resp. to 56.1 ¶ 99)  According to a November 28, 2001, letter memorializing the

meeting, Millares attended the meeting with Le Donni, Assistant Principal Catalano, and two

union representatives.  (Def. Ex. Millares T; Resp. to 56.1 ¶ 100)  It is undisputed that, during

this meeting, Millares was directed to submit her lesson plans, each week, to Le Donni.  (Def.

Ex. Millares T; Resp. to 56.1 ¶ 100)

The day following the meeting, November 29, 2001, was the last day plaintiff

Millares worked for defendant DOE.  (Millares Dep. at 61)  On January 31, 2002, defendant Le

Donni contacted Millares to inquire about her status because she had been absent from work. (Def. Ex. Millares R; Resp. to 56.1 ¶ 102)  It is undisputed that Millares refused to answer Le Donni's questions.  (Def. Ex. Millares R; Resp. to 56.1 ¶ 102)  On February 1, 2002, Le Donni referred Millares to the DOE Medical Bureau to determine whether she was medically fit to return to work.  (Def. Ex. Millares U; Resp. to 56.1 ¶ 103).  On February 26, 2002, the DOE Medical Bureau examined Millares and concluded that she was unfit to return to work.  (Def. Ex. Millares V; Resp. to 56.1 ¶ 104)  On June 13, 2002, Millares received an unsatisfactory rating for her annual performance evaluation, in part, because she had been absent for more than fifty days. (Def. Ex. Millares W; Resp. to 56.1 ¶ 106)

On August 19, 2002, plaintiff Millares applied for a leave of absence without pay for restoration of health from September 3, 2002 to January 31, 2003.  (Def. Ex. Millares X; Resp. to 56.1 ¶ 107)  On August 20, 2002, Dr. Audrey Jacobsen of the DOE Medical Bureau approved Millares's request.  (Def. Ex. Millares X; Resp. to 56.1 ¶ 107)  Thereafter, Millares filed her charges of age discrimination with the EEOC on August 29, 2002.  (Def. Ex. Millares Y at 1; Resp. to 56.1 ¶ 108)

On December 9, 2002, plaintiff Millares filed a disability claim with the union in which she certified that the illness from which she suffered was not job-related.  (Def. Ex. Millares A; Resp. to 56.1 ¶ 109)  On January 15, 2003, Millares applied for and received a leave of absence without pay from February 1, 2003 to June 30, 2003.  (Def. Ex. Millares Z; Resp. to 56.1 ¶ 110)  On February 26, 2003, Millares submitted her application for an "Ordinary Disability Retirement."  (Def. Ex. Millares AA; Resp. to 56.1 ¶ 111)  On June 18, 2003, Millares retired under the "Ordinary Disability Retirement" pension plan.  (Def. Ex. Millares AA: Resp. to 56.1 ¶ 112)

1.  <u>Discrimination</u>

In moving for summary judgment on plaintiff Millares's discrimination claim, defendants argue that the statute of limitations bars any claim that arose more than 300 days prior to the August 29, 2002 EEOC filing, <u>i.e.</u> November 2, 2001.  (Def. Mem. at 24-25)  Prior to November 2, 2001, plaintiff Millares received several negative lesson evaluations, critical letters to her file and a "U" rating for the 1999-2000 school year.  (Def. Exs. Millares C-P; Resp. to 56.1 ¶¶ 83-95)  To the extent that plaintiffs are invoking the continuing violation doctrine, there is no evidence in the record of any actual or constructive "specific[,] ongoing discriminatory policies or practices" on the part of defendant DOE.  <u>See Weeks</u>, 273 F.3d at 82 (quoting <u>Quinn</u>, 159 F.3d at 766).  At most, these are unconnected events that, viewed most favorably to Millares, do not amount to ongoing policy or practice.  True, pre-November 2, 2001 events may be relevant to her claim, including her assertion that she was constructively discharged, but no pre-November 2, 2001 occurrence in this record sheds significant light upon post-November 2 occurrences.  <u>See Jute</u>, 420 F.3d at 176-77.

As to the constructive discharge theory, defendants argue that plaintiff Millares's health – not her employer's conduct – was the reason she decided to stop working at P.S. 247 and eventually retire.  In her deposition, Millares testified that she had applied for "Ordinary Disability Retirement" due to her health problems (Millares Dep. at 90), but she also testified that she believed these problems resulted from work-related stress (<u>Id.</u> at 91).  Viewing the evidence in the record most favorably to the non-movant, I will assume for purposes of defendants' motion that a reasonable jury could find that there existed at least some connection between plaintiff Millares's health and her job.  But establishing a connection between her health and her job is not all that is needed to establish a constructive discharge claim.

In <u>Spence v. Maryland Cas. Co.</u>, 995 F.2d 1147 (2d Cir. 1993), the Second Circuit addressed the question of whether a former employee could assert an ADEA discrimination

claim based upon the allegation that the employee was constructively discharged due to work-related health problems.  The court stated:

> A constructive discharge may be found on the basis of evidence that an employer deliberately sought to place an employee in a position that jeopardized his or her health.  See, e.g., Meyer v. Brown & Root Construction Co., 661 F.2d 369, 371-72 (5th Cir. 1981) (constructive discharge in violation of Title VII where pregnant employee transferred to position requiring heavy manual labor).  But an employer is entitled to insist on as high a standard of work performance as it deems appropriate, and the fact that an employee develops stress-related ill health from the demands of his voluntarily undertaken position or from criticisms of his performance, and as a result determines that health considerations mandate his resignation, does not normally amount to a constructive discharge by the employer.

Id. at 1156.  In Spence, the Second Circuit noted evidence that the employee had been ridiculed by his supervisor, blamed for not knowing about certain changes in company practice of which no one had notified him, written up and criticized for poor performance, threatened with termination, and placed on probation; eventually, the employee suffered high blood pressure as a result of his supervisor's treatment.  Id. at 1149-54.  However, the court also observed that the employer's criticism were "quite concrete", that the employee tried to meet them, that there was no evidence of any intolerable employer conduct during the six months preceding the employee's cessation of work and that the employee had a "quite effective alternative to resignation" – specifically, lodging a complaint.  Id. at 1157.  "Unless the evidence is sufficient to permit a rational trier of fact to find that the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign, a claim of constructive discharge should be dismissed as a matter of law . . . ."  Id. at 1156.

The evidence in the record before me describes a work environment far less severe than that which was deemed not actionable in Spence.  Plaintiff Millares did not experience constant criticism or ridicule from her superiors, but rather received letters providing detailed feedback on specific lessons she had taught or instances in which she fell short in her

responsibilities.  In addition, the Second Circuit questioned the severity of the work environment

for the employee in <u>Spence</u> because there was no evidence that he experienced anything relevant

to his discrimination claim in the six months preceding his departure.  Here, Millares sought and

received a sabbatical for the 2000-01 school year, which ended only a few months before her last

day at work.  (Millares Dep. at 32-33)  When she returned, Millares forgot, for the second time,

to cover a scheduled class, and defendant Le Donni memorialized this incident in a letter placed

in Millares's file.  (Def. Ex. Millares R; Resp. to 56.1 ¶ 98)  Le Donni also directed Millares to

submit her lesson plans to her in advance.  (Def. Ex. Millares S; Resp. to 56.1 ¶ 99)  Indeed,

Millares stopped coming to work only a few days after this direction.  (Millares Dep. at 61)

Viewing the facts most favorably to plaintiff Millares, there is no evidence from which a

reasonable jury could conclude that her working conditions, "viewed as a whole, [were] so

difficult or unpleasant that a reasonable person in the employee's shoes would have felt

compelled to resign."  <u>Terry</u>, 336 F.3d at 152 (internal quotations omitted).

        Even if plaintiff Millares had come forward with evidence that she had been

constructively discharged, there is no evidence that this occurred in circumstances from which a

reasonable jury could infer discriminatory motive.  <u>See</u> <u>Chertkova</u>, 92 F.3d at 91.  In her

deposition, Millares testified in general, non-specific and vague terms of defendant Le Donni's

"not being nice" to her.  (<u>Id.</u> at 111)  Specifically, Millares stated:

> It was a constant battle practically every single day, either eye contact, frequent
> depravation of supplies, deparavation of supplies, calling into the office for
> nonsense, verbal abuse, child abuse, dirty looks . . . .
>
> Job assignments, lack of niceties towards me during the day, which she would
> have done to the other teachers that were younger.  Mentoring, just common
> understanding, coming to talk to me about something instead of just writing me
> up in a letter.  Just basic humanity and kindness.

(Millares Dep. at 110-11)  As to what Millares meant by "job assignments," she testified

that the younger teacher who had used her room previously had a better desk and supplies, but Millares also testified that she never requested a different desk or supplies because she "should not have had to ask."  (Millares Dep. at 111-12).  There is no evidence that defendant Le Donni or any other defendant had any involvement in deciding which desk or supplies be given to plaintiff Millares.  While such assertions may give rise to a reasonable inference that Le Donni was gruff, neglectful or perhaps even rude in her interactions with Millares, they do not support a finding that Millares's alleged constructive discharge resulted from discriminatory animus.

Summary judgment is granted to defendants as to plaintiff Millares's claim of age discrimination under the ADEA.

### 2.  Retaliation

Even though plaintiff Millares's theory of constructive discharge does not survive as an ADEA discrimination claim, I will separately consider whether it survives in the context of her retaliation claim.  (Pl. Mem. at 22-23)  In moving for summary judgment on Millares's retaliation claim, defendants argue that plaintiffs "cannot show that [Millares] was retaliated against for engaging in any protected activity . . . [because] she did not work even one day following the date her charge was filed."  (Def. Mem. at 26)  In opposing defendants' motion, plaintiffs argue that Millares experienced "constant harassment" by defendant Le Donni, which led her to become ill, seek disability leave, then seek unpaid leave and eventually retire.  (Pl. Mem. at 22-23)

After plaintiff Millares filed her charge with the EEOC, she applied for and received unpaid leave (Def. Ex. Millares Z; Resp. to 56.1 ¶ 110), and then applied for and retired under the "Ordinary Disability Retirement" plan.  (Def. Ex. Millares AA: Resp. to 56.1 ¶ 112) There is no other evidence in the record of interaction between Millares and defendant DOE after she engaged in protected activity.  No reasonable jury could find that defendant DOE's mere

cooperation and compliance with plaintiff Millares's requests amounted to adverse employment action, even under the standard articulated in <u>Burlington Northern</u>, 126 S. Ct. at 2405.

Plaintiffs cite no authority for the proposition that unpaid leave requested by the employee constitutes an "intolerable work atmosphere" for purposes of a constructive discharge claim.  To the extent that plaintiff Millares is arguing that this Court should consider the circumstances leading to her filing her EEOC charge in the context of her retaliation claim, the Supreme Court in <u>Burlington Northern</u> instructed precisely the opposite.  126 S. Ct. at 2416. "Rather, the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint."  <u>Id.</u>  No reasonable jury could conclude that plaintiff Millares's work atmosphere had become "so intolerable that [s]he [was] forced to quit involuntarily."  <u>Terry</u>, 336 F.3d at 151-52.

Summary judgment is granted in favor of defendants as to plaintiff Millares's claims.


D.  <u>Marsha Silverstein</u>

Plaintiff Marsha Silverstein was born in 1948 and, in 1969, was hired as a teacher with a so-called Common Branch license.  (Def. Exs. Silverstein A, B; Resp. to 56.1 ¶ 113)  In 1988, Silverstein began working as a tenured teacher at P.S. 247.  (Def. Ex. Silverstein B; Resp. to 56.1 ¶ 113)  In February 2000, Silverstein relinquished her tenured position and became an English as a Second Language ("ESL") teacher at P.S. 247 on a probationary status.  (Def. Ex. Silverstein B; Resp. to 56.1 ¶ 114)  In September 2001, Silverstein was "excessed" to P.S. 48 because another, more senior ESL teacher was returning from sabbatical.  (Def. Ex. Silverstein B; Resp. to 56.1 ¶ 123)

On November 26, 2001, defendant Diane Picucci, the Principal of P.S. 48, observed plaintiff Silverstein teaching a class.  (Def. Ex. Silverstein J; Resp. to 56.1 ¶ 125)  In

writing her observation report, Picucci stated that the "aim" of the lesson was not realized and that Silverstein's time management was poor.  (Def. Ex. Silverstein J; Resp. to 56.1 ¶ 125) Picucci rated the lesson "unsatisfactory".  (Def. Ex. Silverstein J; Resp. to 56.1 ¶ 125)  Assistant Principal Richard Ogno rated a class taught by Silverstein soon thereafter as "unsatisfactory" for similar reasons.  (Def. Ex. Silverstein K; Resp. to 56.1 ¶ 126)

On November 30, 2001, plaintiff Silverstein received a letter from defendant Grippo, stating as follows:

> Dear Ms. Silverstein:
>
> This is to inform you in accordance with Section 2573 Subdivision I of the State Education Law, I am denying your Certification of Completion of Probation in Community School District Twenty.
>
> Under the Collective Bargaining Agreement between the Board of Education and the United Federation of Teachers, you are entitled to the review procedures as prescribed in Article 5, Section 5.3.4.C of the Bylaws of the Board of Education.
>
> Please be advised that your service under this appointment shall terminate as of the close of business January 31, 2002.

(Pl. Ex. AA)

Plaintiff Silverstein was assigned a "buddy teacher" and a "Staff Developer" from the District Office to assist her with her teaching.  (Def. Ex. Silverstein K; Resp. to 56.1 ¶ 126) Subsequent to Silverstein receiving this assistance, defendant Picucci rated as "unsatisfactory" a January 15, 2002, class taught by Silverstein.  (Def. Ex. Silverstein L; Resp. to 56.1 ¶ 127)  In addition, Picucci wrote to Silverstein that the motivation and directions of the lesson were unclear and that Silverstein appeared to be unaware of the students' names and ability levels. (Def. Ex. Silverstein L; Resp. to 56.1 ¶ 127)

On January 23, 2002, Bina Mancini, the Director of Bilingual Programs for defendant DOE, observed plaintiff Silverstein teaching a class.  (Def. Ex. Silverstein M; Resp. to 56.1 ¶ 128)  Mancini rated Silverstein's lesson "unsatisfactory" for the following stated reasons:

attendance was not taken; Silverstein did not collaborate with other teachers in planning the lesson; Silverstein did not fully develop each activity before proceeding to the next one; and Silverstein did not implement a writing exercise.  (Def. Ex. Silverstein M; Resp. to 56.1 ¶ 128) Silverstein received an unsatisfactory performance evaluation for the period of September 4, 2001 to January 31, 2002.  (Def. Ex. Silverstein N; Resp. to 56.1 ¶ 129)

On February 1, 2002, plaintiff Silverstein was transferred to P.S. 105 and taught a third grade class until March 1, 2002.  (Def. Exs. Silverstein B, O; Resp. to 56.1 ¶¶ 130-31) Silverstein received the same salary as she had at P.S. 247, and she received a satisfactory performance rating for this period.  (Def. Exs. Silverstein B, O; Resp. to 56.1 ¶¶ 130-31) Silverstein then went on sick leave for approximately one year.  (Def. Exs. Silverstein O, P, R; Resp. to 56.1 ¶¶ 132, 134)  During the period of such leave, Silverstein filed a charge of age discrimination with the EEOC on August 29, 2002.  (Def. Ex. Silverstein Q at 1)

On March 31, 2003, plaintiff Silverstein returned to teaching at a different school, P.S. 69.  (Def. Ex. Silverstein B; Resp. to 56.1 ¶ 135)  On April 10, 2003, Principal Maria Bromme observed Silverstein's teaching.  (Def. Ex. Silverstein S; Resp. to 56.1 ¶ 136)  Bromme rated the lesson "unsatisfactory" because Silverstein did not conduct a shared reading activity, even though the materials for such activity had been provided to her beforehand and had been discussed at the pre-observation conference.  (Def. Ex. Silverstein S; Resp. to 56.1 ¶ 136) Bromme stated in her letter to Silverstein that the "aim" of the lesson had not been realized and that several students were not engaged in the lesson.  (Def. Ex. Silverstein S; Resp. to 56.1 ¶ 136)  In addition, Bromme noted that one student was attempting to place a pencil into an electrical socket while two other students watched and laughed, that two female students attempted to unravel the hem of another student's pants, and that Silverstein failed to intervene in either of these incidents.  (Def. Ex. Silverstein S)  On May 22, 2003, Silverstein left one of her students unsupervised in the hallway.  (Def. Ex. Silverstein T; Resp. to 56.1 ¶ 137)

On June 18, 2003, plaintiff Silverstein completed an application for retirement from employment with defendant DOE.  (Def. Ex. Silverstein A; Resp. to 56.1 ¶ 139)  On June 26, 2003, Silverstein received an unsatisfactory performance evaluation from P.S. 69 for the 2002-03 school year.  (Def. Ex. Silverstein U; Resp. to 56.1 ¶ 138)  On July 1, 2003, Silverstein retired.  (Def. Ex. Silverstein A; Resp. to 56.1 ¶ 139)

1.  Discrimination

In moving for summary judgment, defendants argue that portions of plaintiff Silverstein's discrimination claim must be dismissed on the ground that they predate November 2, 2001, which is 300 days before she filed her August 29, 2002 charge with the EEOC.  (Def. Mem. at 27)  See Holowecki, 440 F.3d at 558 (citing 29 U.S.C. §§ 626(d), 633(b))  Specifically, defendants identify the following as time-barred: the denial by defendants Grippo and Le Donni of an ESL license to Silverstein (Def. Ex. Silverstein G; Resp. to 56.1 ¶¶ 119-21), the fact that her course was "excessed" (Def. Exs. Silverstein B, H; Resp. to 56.1 ¶ 123), and several negative evaluations and letters to file (Def. Exs. Silverstein C-F, I; Resp. to 56.1 ¶¶ 115-18, 124).  In opposing defendants' motion, plaintiffs have come forward with no evidence from which a reasonable jury could conclude that the defendants' conduct constituted a continuing practice for this claim.  (Pl. Mem. at 24-26)  I will consider only those portions of Silverstein's claim that arose after November 2, 2001 – i.e. negative evaluations and her transfer from P.S. 48 to P.S. 105 – as potential adverse employment actions but will consider pre-November 2, 2001 events, where appropriate, as relevant "background evidence".  See Jute, 420 F.3d at 176-77.

As to post-November 2, 2001 events, defendants argue that plaintiffs have come forward with no evidence from which a reasonable jury could conclude that plaintiff Silverstein suffered an adverse employment action.  (Def. Mem. at 27-28)  Defendants also argue that plaintiffs have not met the fourth prong of their prima facie burden – that the alleged adverse

43

employment action occurred in circumstances giving rise to an inference of discrimination.  (Id.

at 28)  Defendants further argue that, even if a prima facie case had been made, they have come

forward with evidence of their legitimate, nondiscriminatory reasons for their action (Id.) and

plaintiffs have offered no evidence that such reasons are pretextual (Def. 7/14/06 Supp. Mem. at

7).

I will first address the adverse employment action prong of the prima facie case.

In opposing summary judgment, plaintiffs have come forward with no evidence that any negative

performance evaluation – whether of a specific lesson or of an entire school year's performance

– caused any materially adverse change in the terms or conditions of plaintiff Silverstein's

employment.  As noted above, the Second Circuit has held that a negative performance

evaluation – without more – is not an adverse employment action.  Sanders, 361 F.3d at 756.

See also Weeks, 273 F.3d at 86 ("It hardly needs saying that criticism of an employee (which is

part of training and necessary to allow employees to develop, improve and avoid discipline) is

not an adverse employment action.").  As to the negative lesson evaluations, plaintiffs simply

dispute the views set forth in those evaluations by introducing a letter written by a different

principal generally commending Silverstein on her teaching.  (Pl. Ex. Z)  Whether the criticism

was warranted or not, there is no evidence that any lesson evaluation had any tangible impact on

the terms or conditions of plaintiff Silverstein's employment.

It is undisputed that plaintiff Silverstein received a "U" rating for the period of

September 4, 2001 to January 31, 2002.  (Def. Ex. Silverstein N; Resp. to 56.1 ¶ 129)  Plaintiffs

argue that such a rating constitutes an adverse employment action because it "has several adverse

consequences including ineligibility for salary step increases; inability to renew a temporary

license; extinguishing the retention rights for regular substitutes; ineligibility for per session

assignments that require satisfactory ratings in the postings; and the basis to proceed with

termination."  (Pl. Mem. at 9, citing Pl. Ex. F at 37; Pl. 7/24/06 Supp. Mem. at 17)  However, in

support of their argument, plaintiffs direct this Court to only one piece of evidence, a document entitled "Frequently Asked Questions," apparently authored by the Office of Labor Relations of defendant DOE.  (Pl. Ex. F)  In explaining the significance of a "U" rating, the document states that such an evaluation has "several potential adverse consequences," including the those by plaintiffs in their memorandum.  (Id. at 37)  The Second Circuit has not held that employer conduct is materially adverse merely because it has the potential to cause negative results.  Rather, the Second Circuit has required evidence of actual "negative ramifications for the plaintiff's job conditions."  Fairbrother, 412 F.3d at 56 (noting, as examples, "'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation").  Plaintiffs have had a full and fair opportunity to conduct discovery.  If there had been evidence that a "U" rating, in fact, precluded "step" increases or caused similar negative changes in a teacher's employment, it would have been a simple matter to point to such evidence.  Plaintiffs have not.  No reasonable jury could conclude, based upon the evidence in the record before me, that any evaluation of Silverstein's performance constituted an adverse employment action for purposes of her discrimination claim.

Plaintiff Silverstein argues that her transfer from P.S. 48 to P.S. 105 – the only transfer during the limitations period – is an adverse employment action.  She argues that the transfer is actionable because she was assigned to teach third grade students instead of ESL students.  (Pl. Mem. at 25)  Silverstein testified that this meant that she was teaching "outside her license area," which, if true, would arguably constitute a materially adverse change in the terms or conditions of her employment.  (Silverstein Dep. at 156)  Silverstein concedes that, as an ESL teacher, she was in a probationary status.  (Def. Ex. Silverstein B; Resp. to 56.1 ¶¶ 114, 123)  Plaintiff also testified that she "didn't feel like [she] was unable to teach the third grade."  (Silverstein Dep. at 158)

The facts relevant to this claim closely resemble those of Galabya, 202 F.3d at 636. In that case, the Second Circuit affirmed the district court's grant of summary judgment to the defendant – as here, the DOE – because the plaintiff had not come forward with any evidence from which a reasonable jury could find that his reassignment to teach outside his expertise caused a "materially adverse change in the terms and conditions of employment." Id. at 640-42 (citations and quotations omitted). In doing so, the Second Circuit distinguished the case from Rodriguez v. Bd. of Educ., 620 F.3d 362 (2d Cir. 1980), in which the plaintiff had been reassigned from teaching junior high art classes to elementary school art classes. Galabya, 202 F.3d at 640-42. In that case, the plaintiff had proffered evidence that she had tailored her master's and doctoral coursework to prepare her for teaching junior high students and that "the two jobs were 'profoundly different,' so different, in fact, as to render her twenty years of experience 'useless.'" Id. at 640-41 (quoting Rodriguez, 620 F.3d at 366).

Viewed in a light most favorable to plaintiffs, the evidence relating to plaintiff Silverstein's assertion that her transfer to P.S. 105 constituted an adverse employment action is closer to Galabya than Rodriguez. While plaintiff undoubtedly preferred not to teach a third grade class at a different school, there is no evidence that plaintiff lacked the skills for the position. Cf. Ticali v. Roman Catholic Diocese of Brooklyn, 41 F.Supp.2d 249, 265 (E.D.N.Y 1999), aff'd, 201 F.3d 432 (2d Cir. 1999) (granting summary judgment to employer because employee produced "no material evidence that her transfer [from teaching first grade to pre-kindergarten] obliged her to perform tasks that were less appropriate for her skills than her prior position or adverse to her in any other legally cognizable way"). In addition, there is no evidence here – as there was in Rodriguez, 620 F.3d at 366 – that Silverstein had previously undertaken substantial professional development in order to prepare for her specialty, only then to be transferred to a less distinguished position. "Without a real change in the conditions of employment, a transfer is only a mere inconvenience or an alteration of job responsibilities, and

46

hence not materially adverse." <u>Fairbrother</u>, 412 F.3d at 56 (quotations omitted) (affirming summary judgment to employer where transfer of employee resulted in an occasionally longer walk and emotional losses, but no change in "wages, retirement credits, benefits, or overtime opportunities"). Plaintiffs have failed to come forward with evidence from which a reasonable jury could conclude that Silverstein's transfer from a position as an ESL teacher at P.S. 48 to a third grade teacher at P.S. 105 constituted an adverse employment action.

Finally, defendants move for summary judgment on the ground that plaintiff was not constructively discharged. (Def. Mem. at 27-28) Specifically, defendants argue that "unsatisfactory ratings, increased scrutiny [by supervisors] and allegations made against [plaintiff Silverstein]" do not constitute a constructive discharge. (<u>Id.</u>) In opposing defendants' motion, plaintiffs argue that defendants' failure to allow Silverstein to teach ESL students at P.S. 105 and their increased scrutiny of Silverstein at P.S. 69 constitute a constructive discharge. (Pl. Mem. at 24-25)

I have already rejected the argument that either plaintiff Silverstein's transfer from P.S. 48 to P.S. 105 or the failure of defendant DOE to assign her to teach ESL students was an adverse employment action. As to plaintiff Silverstein's complaints about the increased scrutiny of her work at P.S. 69, the only incident about which she testified in her deposition was the fact that defendant Bromme conducted a classroom observation shortly after her arrival. (Silverstein Dep. at 179-82) A supervisor observing the work of an employee and providing constructive criticism is not an adverse employment action. <u>Sanders</u>, 361 F.3d at 756; <u>Weeks</u>, 273 F.3d at 86. Other than this incident, the only evidence in the record regarding Silverstein's experience at P.S. 69 – her last place of work while employed by defendant DOE – was a letter from Bromme noting that Silverstein had left one of her students unsupervised in the hallway. (Def. Ex. Silverstein T; Resp. to 56.1 ¶ 137) A few weeks later, Silverstein applied for retirement. (Def. Ex. Silverstein A; Resp. to 56.1 ¶ 139)

Finally, plaintiff Silverstein testified that these events resulted in her developing a stress disorder.  (Silverstein Dep. at 162)  As with plaintiff Millares's similar claim, the evidence in the record regarding Silverstein's work experiences falls far short of an actionable constructive discharge claim.  See Spence, 995 F.2d at 1147-54, 1157 (affirming summary judgment to employer, despite evidence that employer's "constant criticisms" led to employee's high blood pressure).

Viewed as a whole and in a light most favorable to Silverstein, the evidence, taken as a whole, would not support an inference that Silverstein's working conditions were "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  Chertkova, 92 F.3d at 89.

Even if plaintiffs had come forward with evidence from which a jury could conclude that plaintiff Silverstein had suffered an adverse employment action, they have failed to come forward with any evidence that could support an inference of discrimination.  In their memorandum, plaintiffs direct this Court to no evidence that these class evaluations or the unsatisfactory ratings were motivated by a discriminatory animus.  Instead, plaintiffs only cite evidence of allegedly unfair actions by defendant DOE and its supervisory employees. Specifically, plaintiffs state as follows:

> Plaintiff had began [sic] to receive negative letters in her file; she was given an
> empty classroom with no materials; she was forced to undergo evaluations after
> extremely minimal time on the job (not enough time to become familiar with the
> curriculum, let alone learn the students' names); she was not sent to ESL meetings
> with other ESL teachers; and another teacher was coerced into writing a negative
> letter against her.

(Pl. Mem. at 25, citing Silverstein Dep. at 179, 181, 189).  There is no evidence that this conduct – assuming arguendo that it occurred – resulted from any discriminatory motive.  A plaintiff claiming age discrimination may not rely solely on his or her status as a member of a protected class and the fact that he or she experienced what might constitute an adverse employment

action.  <u>Terry</u>, 336 F.3d at 137-138 (stating the elements of a claim of age discrimination under

the ADEA).

        Lacking any evidence to support a prima facie case of discrimination, plaintiff

Silverstein's discrimination claim fails as a matter of law.

        2.  <u>Retaliation</u>

        In moving for summary judgment on plaintiff Silverstein's retaliation claim,

defendants argue that plaintiffs cannot show that Silverstein was constructively discharged.

(Def. Mem. at 28-29)  Furthermore, even if a reasonable jury could find that Silverstein was

constructively discharged, defendants argue that there exists no evidence of a causal connection

between her protected activity and any actions by defendant DOE.  (Def. Mem. at 29)  In

opposing summary judgment, plaintiffs argue that defendants retaliated against Silverstein by

giving her an unsatisfactory rating for the 2002-2003 school year in June 2003, ten months after

she filed her EEOC charge.  (Pl. 7/24/06 Supp. Mem. at 26)

        With regard to the allegation of constructive discharge, plaintiffs have failed to

come forward with any evidence from which a reasonable jury could find that any of the

defendants "intentionally create[d] a work atmosphere so intolerable" that plaintiff Silverstein

was "forced to quit involuntarily."  <u>Terry</u>, 336 F.3d at 151-52.  An employer's criticisms of an

employee's work, without more, do not give rise to a claim for constructive discharge.  <u>Spence</u>,

995 F.2d at 1156.  Unlike the plaintiffs in <u>Terry</u>, plaintiffs here have failed to identify any

specific comments made by supervisors or co-workers in the employment of defendant DOE that

would allow a reasonable jury to find that Silverstein's working conditions had become

intolerable for purposes of her constructive discharge claim.

        Instead, the only evidence in the record is that plaintiff Silverstein received a

negative evaluation of her April 10, 2003 lesson (Def. Ex. Silverstein S; Resp. to 56.1 ¶ 136),

received an unsatisfactory rating for the 2002-03 school year (Def. Ex. Silverstein U; Resp. to 56.1 ¶ 138) and then applied for retirement (Def. Ex. Silverstein A; Resp. to 56.1 ¶ 139).  No reasonable jury could conclude that the negative lesson evaluation and the negative annual evaluation made Silverstein's working conditions intolerable, particularly given that her employer made special arrangements for Silverstein to receive additional professional development.  (Def. Ex. Silverstein K; Resp. to 56.1 ¶ 126)

        Whether these evaluations themselves constitute adverse employer conduct for purposes of a retaliation claim is another matter.  In Burlington Northern, the Supreme Court required that such conduct be "materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 126 S. Ct. at 2415 (internal quotations omitted).  After Burlington Northern, Judge Rakoff reconsidered a grant of summary judgment to an employer and concluded that no reasonable jury could find that a Title VII plaintiff's negative job evaluations met the Supreme Court's arguably broader standard due to the absence of "evidence in the record that any negative consequences resulted from those evaluations."  Jackson v. City Univ. of N.Y., 2006 U.S. Dist. LEXIS 43338, *3 (S.D.N.Y. June 26, 2006).  See also Langer v. Sec'y of the Treasury, 2006 WL 2076577, *2 (E.D. Wis. July 24, 2006) ("[A]bsent some tangible job consequence, negative performance evaluations generally do not constitute adverse employment actions." (internal citation and quotation omitted)).  I find Judge Rakoff's reasoning persuasive.  Here, plaintiffs have similarly failed to produce such evidence of any negative consequences resulting from the evaluations of either plaintiff Silverstein's April 10, 2003 lesson or the 2002-03 school year.  In the context of other plaintiffs' retaliation claims, plaintiffs argue that receiving an unsatisfactory annual rating meant that the teacher could not receive "per session" work.  See, e.g., Pl. 7/24/06 Supp. Mem. at 18 (discussing plaintiff Yialouris-Papasmiras' discrimination claim).  However, as with those claims, there is no evidence in the record that Silverstein was otherwise eligible for such work,

that such work was available, or that Silverstein actually applied for and was denied such work. Therefore, Silverstein's claim of ADEA retaliation fails as a matter of law.

Summary judgment is granted as to plaintiff Silverstein's claim of retaliation under the ADEA.

### E.   John Casciato

Plaintiff John Casciato was born in 1952.  (Def. Ex. Casciato A; Resp. to 56.1 ¶ 140)  In October 2001, Casciato was hired as a part-time, non-certified art teacher at P.S. 112. (Casciato Dep. at 13, 20)  At first, Casciato worked two days per week.  (Casciato Dep. at 18) At some point early in his employment, Casciato requested a third day of work, and defendant DOE – with defendant Grippo's personal involvement – approved the request.  (Casciato Dep. at 16-18)  This enabled Casciato to receive health benefits immediately.  (Casciato Dep. at 17)

At some point during the 2001-2002 school year, P.S. 112 advertised for a teacher for an Art Cluster position.  (Def. Ex. Casciato E; Resp to 56.1 ¶ 146)  It is undisputed that this position required the applicant to pass two certification exams and to attend various seminars and complete substantial paperwork.  (Casciato Dep. at 66; 56.1 ¶ 147)  In May 2002, plaintiff Casciato took one of the two exams, the ATSW exam.  (Casciato Dep. at 64)  Casciato was lacking the results of one of the exams, but had all other paperwork completed:

> By the end of the school year[,] I had everything I needed to qualify as a certified
> New York State teacher other than my results from [the] ASTW [exam], which
> was still out there in the mail, and I had them all in front of me, all the little
> papers that I needed.  I just hadn't sent them in because I was waiting for the final
> one to send in to the State.

(Casciato Dep. at 66)

In June 2002, plaintiff Casciato applied for the Art Cluster position, despite the fact that he was not yet certified for the position.  (Casciato Dep. at 93)  Principal Verdemare told Casciato that he was not eligible because he was not certified.  (Casciato Dep. at 93)  In

addition, Verdemare told Casciato that P.S. 112 did not have a need for a part-time art teacher the following school year because the school was hiring for a full-time Art Cluster position. (Casciato Dep. at 74)  In a letter dated June 14, 2002, defendant Grippo thanked Casciato for his work in the 2001-2002 school year and informed Casciato that he anticipated "a need for per diem substitutes for the 2002-2003 school year."  (Def. Ex. Casciato F; Resp. to 56.1 ¶ 150)  In July 2002, Casciato was notified that he failed the ATSW exam.  (Casciato Dep. at 67)

Plaintiff Casciato filed his EEOC charge on September 26, 2002.  (Def. Ex. Casciato A at 1)  Casciato did not become certified to teach art classes until February 2004. (Casciato Dep. at 20)  Upon completing certification, Casciato applied and was hired for a full-time position teaching art at P.S. 212.  (Casciato Dep. at 100)  In September 2004, Casciato began working at P.S. 212.  (Casciato Dep. at 100-01)

### 1.  Discrimination

In moving for summary judgment on plaintiff Casciato's claim, defendants argue that plaintiffs have failed to come forward with evidence that Casciato meets the second prong of a prima facie case of age discrimination – that he was qualified for the position in question. (Def. Mem. at 37)  In opposing summary judgment, plaintiffs argue that Casciato was qualified because he had the "same pending certificate" as the teacher eventually hired for the position. (Pl. Mem. at 13)

It is settled law that a plaintiff must have been qualified for the position that forms the basis of his or her claim under the ADEA.  Terry, 336 F.3d at 137-138.  Although a prima facie case of unlawful discrimination requires only that the plaintiff show that he or she was minimally qualified, Owens, 934 F.2d at 409, such minimal qualifications must have existed at the time the plaintiff applied for the position at issue.  In the field of education, courts have held that a teacher lacking the requisite certification to teach cannot complain of a school board's

failure to hire.  See, e.g., Frazier v. Garrison I.S.D., 980 F.2d 1514, 1522, 1227-28 (5th Cir.

1993) (affirming district court's denial of class certification for teachers' ADEA claims where

there existed uncontroverted evidence that teachers applied for certified teaching positions after

failing state certification exam); White v. Camden City Bd. of Educ., 251 F.Supp.2d 1242

(D.N.J. 2003), aff'd, 90 Fed.Appx. 437 (3d Cir. 2004) (recognizing the plaintiff's lack of

qualification despite evidence that she had been provisionally certified, a status inadequate for a

permanent position).  Indeed, the Second Circuit has recognized the appropriateness of an

employer's consideration of whether an employee meets licensure or certification requirements:

> Employers frequently seek to hire people who have and can maintain a status
> conferred by some other agency (certified teachers, off-duty police, licensed
> pilots), where that status serves as an imprimatur of training, character, or
> necessary physical or mental condition.  The ADEA does not outlaw such
> considerations.

Johnson v. New York, 49 F.3d 75, 83 (2d Cir. 1995).

In opposing summary judgment, plaintiffs do not argue that requiring state

certification was beyond the authority of defendant DOE or otherwise unreasonable.  In his

deposition, plaintiff Casciato testified that, even though he was not fully certified when he

applied for the position, he anticipated becoming certified by September 2002.  (Casciato Dep. at

93)  However, the federal employment discrimination statutes do not protect those who may at

some point in the future become qualification for a position; qualified is measured at the time the

position is sought.  See Johnson, 49 F.3d at 83.  The undisputed evidence is that Casciato failed

the ATSW exam and, therefore, was not qualified for the position he sought.

Plaintiffs assert that lack of certification ought not be dispositive in this case

because defendants hired a much younger individual, Anya Tucker, for the same position who

was also not certified at the time she applied.  (Pl. Mem. at 13, citing Pl. Ex. EE)  If the

contention were supported by evidence of the type contemplated by Rule 56(c), Fed. R. Civ. P.,

it might create a triable issue of fact as to whether Casciato was qualified, despite his lack of

certification.  See Farmer v. Dothan City Sch., 2006 WL 354323, *33-*34 (M.D. Ala. Jan. 11, 2006) (rejecting plaintiff's lack of certification as a basis for summary judgment in favor of school district where district had previously hired plaintiff for the position for which school district argued he was not qualified).  However, defendants have come forward with evidence (that plaintiffs have not disputed) that Tucker was a certified elementary school art teacher in Florida (Def. Supp. Ex. Casciato H) and was therefore certified in New York based upon a reciprocity agreement between New York and Florida (Def. Supp. Ex. Casciato I).  There is no evidence that Tucker took and failed the ATSW exam; indeed, the evidence of record is that, by reason of reciprocity, she was certified without the necessity of taking the exam.  Defendant Verdemare testified that Frances Ferrier, the District Cultural Arts Director, had informed her that Tucker's Florida certification meant that Tucker was certified in New York.  (Verdemare Dep. at 150)  In opposition to the motion, plaintiffs refer this Court to what appears to be an internal office document providing "credentials information" about Tucker.  (Pl. Ex. EE; Pl. Mem. at 14)  Plaintiffs apparently rely solely on language in the sparse document that simply states "Type: CNDTNL PROV" (Pl. Ex. EE) to argue that Tucker was not certified when defendants were considering applications.  (Pl. Mem. at 14)  Despite having additional opportunities to submit evidence in opposition to defendants' motion, plaintiffs rely solely upon this notation in a single document and do not respond directly to defendants' evidence that a teacher who is certified in Florida is certified in New York by reason of reciprocity.  Defendants' evidence stands unchallenged.

        Based upon the evidence in the record, no reasonable jury could find that plaintiff Casciato, who failed the ATSW exam and was uncertified, was qualified as a teacher for the Art Cluster position.  Defendant DOE's decision not to hire plaintiff Casciato for this position is the only alleged adverse employment action, and plaintiffs have failed to establish a prima facie case

for this claim.  Summary judgment is granted to defendants on plaintiff Casciato's claim of discrimination.


2.  <u>Retaliation</u>

Plaintiff Casciato filed an EEOC charge on September 26, 2002.  (Def. Ex. Casciato A at 1)  In moving for summary judgment on Casciato's claim of retaliation under the ADEA, defendants argue that he has neither alleged nor provided any supporting evidence that he suffered an adverse employment action after filing his EEOC charge.  (Pl. Mem. at 39)  Plaintiffs assert that Casciato was not considered for a permanent position in retaliation "for supporting the senior teachers."  (Pl. 7/24/06 Supp. Mem. at 14)  However, plaintiffs have come forward with no evidence of any support Casciato gave to such teachers.  Instead, in his deposition, Casciato testified that defendant Verdemare had advised him, on multiple occasions, that "it would not be in [his] best interest to continue to associate with" certain teachers, some of whom are plaintiffs in this action.  (Casciato Dep. at 26)  According to this testimony, Verdemare characterized these individuals as "bad apples".  (<u>Id.</u>)  Even assuming that Verdemare made these statements and viewing the facts most favorably to plaintiffs, there is no evidence of any tangible action by Casciato on behalf of other plaintiffs.  To the contrary, despite Verdemare's alleged comment, the only evidence is that Casciato socialized with these individuals.  (Casciato Dep. at 25-29)

The only protected activity relevant to plaintiff Casciato's retaliation claim is his filing a charge with the EEOC, and there is no evidence in the record that Casciato experienced anything resembling an adverse employment action thereafter.  Rather, the evidence is that, upon completing his certification to teach art classes in February 2004, Casciato applied for and was hired for a full-time art teacher position.  (Casciato Dep. at 100)  In September 2004, Casciato began working at P.S. 212 in this capacity.  (Casciato Dep. at 100-01)

Summary judgment is granted to defendants on plaintiff Casciato's retaliation claim.

### F.   Elizabeth DeMairo-Stingo and Mary Yialouris-Papasmiras

#### 1.   Common Facts

Plaintiff Elizabeth DeMairo-Stingo was born in 1951 (Def. Ex. DeMairo-Stingo A; Resp. to 56.1 ¶ 157), began teaching at P.S. 112 in February 1987 and received tenure in 1990 (DeMairo-Stingo Dep. at 14).  Plaintiff Mary Yialouris-Papasmiras was born in 1959 (Def. Ex. Yialouris A; Resp. to 56.1 ¶ 169), began teaching at P.S. 112 on September 2, 1994, and received tenure on September 1, 1997 (Def. Ex. Yialouris B; Resp. to 56.1 ¶ 169).

In June 2002, plaintiffs DeMairo-Stingo and Yialouris-Papasmiras – and another teacher Becky Dweck – acted as chaperones for a senior class trip to Baltimore.  (DeMairo-Stingo Dep. at 72)  On the return trip, DeMairo-Stingo and Yialouris-Papasmiras directed the bus drivers to make an unplanned stop.  (DeMairo-Stingo Dep. at 72-74; Yialouris Dep. at 96)  DeMairo-Stingo's bag and belongings were on a second bus and not on the one on which she was riding.  (DeMairo-Stingo Dep. at 73; Yialouris-Papasmiras Dep. at 96)  Yialouris-Papasmiras also testified that three parents exited the bus on which DeMairo-Stingo was riding and entered the bus on which Yialouris-Papasmiras was a passenger.  (Yialouris-Papasmiras Dep. at 97)  After the buses resumed the trip, DeMairo-Stingo met with several parents at which time they criticized defendant Verdemare.  (Yialouris-Papasmiras Dep. at 97, 103)  Specifically, the parents discussed Verdemare's alleged failure to discipline a student named Mohammed who had assaulted other students.  (Yialouris-Papasmiras Dep. at 99)  Yialouris-Papasmiras used the public address system of the bus to poll students about whether they had ever been hit by Mohammed.  (Yialouris-Papasmiras Dep. at 99-100)  Yialouris-Papasmiras testified that she

"probably said that [she does not] like" Verdemare at some point during this episode.  (Yialouris-Papasmiras Dep. at 107)

After the bus trip, at least five parents who had served as chaperones wrote letters to Verdemare complaining of the behavior of DeMairo-Stingo and Yialouris-Papasmiras, leading Verdemare to investigate the complaints.  (Def. Ex. DeMairo-Stingo E; Resp. to 56.1 ¶¶ 161-62)  According to these letters, DeMairo-Stingo and Yialouris-Papasmiras told parents that plaintiff Casciato had been fired because he was gay, that Verdemere was an "evil person, a sneak, liar . . . ." and that "parents had to start petitions and pass all this on to other parents."  (Def. Ex. DeMairo-Stingo E at 2-3)

On June 25, 2002, Yialouris-Papasmiras was interviewed by Verdemare about the bus trip.  (Def. Ex. Yialouris D; Resp. to 56.1 ¶ 171)  DeMairo-Stingo also met with her union representative and Verdemare.  (Verdemare Dep. at 52; Resp. to 56.1 ¶ 163)

After conducting her investigation, defendant Verdemare concluded that an incident took place on this trip that, in her words, threatened the safety and well-being of the students.  (Verdemare Dep. at 59; Resp. to 56.1 ¶ 165)  According to the union representative, Marvin Reiskin, the incident was "blown up as a major situation where the parties [– i.e., the teachers in question –] felt that it would probably be to their best interests not to remain at the school under the principal . . . ."  (Reiskin Dep. at 75)  During the summer of 2002, DeMairo-Stingo and Yialouris-Papasmiras – as well as the other teacher, Dweck – were given the option of transferring out of P.S. 112.  (Reiskin Dep. at 75; Resp. to 56.1 ¶ 166)  After being given the choice of three schools, DeMairo-Stingo transferred to P.S. 48 on September 3, 2002.  (DeMairo-Stingo Dep. at 90; Def. Ex. DeMairo-Stingo G; Resp. to 56.1 ¶ 167)  There is no evidence that Yialouris-Papasmiras sought a transfer and she remained at P.S. 112.

On September 10, 2002, there was a fire drill at P.S. 112 that plaintiff Yialouris-Papasmiras claimed was inaudible.  (Def. Ex. Yialouris G; Resp. to 56.1 ¶ 172)  After the fire

drill, Yialouris-Papasmiras directed her students to write letters to defendant Verdemare to the effect that they did not hear the fire alarm.  (Def. Ex. Yialouris G; Yialouris-Papasmiras Dep. at 166)  After receiving these letters, Verdemare called Yialouris-Papasmiras to a meeting and told her that her conduct rose to the level of misconduct.  (Def. Ex. Yialouris G; Resp. to 56.1 ¶ 172)

On September 20, 2002, defendant Verdemare wrote a letter to plaintiff Yialouris-Papasmiras regarding the bus incident and noting:

> This misconduct which was made apparent after the issuance of annual ratings will lead to a reversal of your satisfactory rating for the 2001-2002 school year to unsatisfactory and may lead to further disciplinary action.

(Def. Ex. Yialouris D at 2; Resp. to 56.1 ¶ 173)  On September 24, 2002, Verdemare changed Yialouris-Papasmiras's 2001-2002 annual performance evaluation to unsatisfactory.  (Def. Ex. Yialouris I; Resp. to 56.1 ¶ 174)  Both DeMairo-Stingo and Yialouris-Papasmiras filed their EEOC charges on September 26, 2002.  (Def. Ex. DeMairo-Stingo A at 1; Def. Ex. Yialouris A at 1; Resp. to 56.1 ¶¶ 168, 175)

On October 30, 2002, draft Verdemare observed plaintiff Yialouris-Papasmiras raise her voice to a student.  (Def. Ex. Yialouris J; Resp. to 56.1 ¶ 177)  In her letter to Yialouris-Papasmiras memorializing the incident, Verdemare stated that Yialouris-Papasmiras had been "screaming".  (Def. Ex. Yialouris J; Resp. to 56.1 ¶ 177)  Verdemere also observed Yialouris-Papasmiras sitting in the back of her class calling out exam answers and writing letters to parents.  (Yialouris-Papasmiras Dep. at 205)  Sitting in the back of class while teaching violated the rules set forth in a teacher handbook written by Verdemere.  (Id. at 204)  In her deposition, Yialouris-Papasmiras described the handbook as "self-serving" and contended that she did not violate any rules contained therein because she "wasn't teaching at that moment."  (Id. at 204)  On December 4, 2002, Yialouris-Papasmiras filed a complaint of discrimination against defendants Grippo and Verdemare with the Office of Equal Employment of defendant DOE.  (Def. Ex. Yialouris L; Resp. to 56.1 ¶ 178)

58

On February 3, 2003, defendant Verdemare conducted a classroom observation of plaintiff Yialouris-Papasmiras teaching a class.  (Def. Ex. Yialouris M; Resp. to 56.1 ¶ 179) Verdemare noted that Yialouris-Papasmiras had not written the "aim" or "focus" of the lesson she was teaching on the board and that the activity in which she was engaged was not in her lesson plan.  (Def. Ex. Yialouris M; Resp. to 56.1 ¶ 179)  On May 7, 2003, Verdemare observed another lesson and noted that Yialouris-Papasmiras again failed to write the "aim" or "focus" on the board.  (Def. Ex. Yialouris N; Resp. to 56.1 ¶ 180)  In her post-observation report to Yialouris-Papasmiras, Verdemare also stated that Yialouris-Papasmiras had used confusing writing models and that the students had not been given sufficient time to complete the lesson. (Def. Ex. Yialouris N; Resp. to 56.1 ¶ 180)

On May 13, 2003, plaintiff Yialouris-Papasmiras applied for a transfer to another school for medical reasons.  (Yialouris-Papasmiras Dep. at 39)  On May 23, 2003, Verdemare observed Yialouris-Papasmiras filling out report cards during class time.  (Def. Ex. Yialouris P; Resp. to 56.1 ¶ 182)  Verdemare wrote a letter to Yialouris-Papasmiras stating that this was an inappropriate use of instructional time.  (Def. Ex. Yialouris P; Resp. to 56.1 ¶ 182)  On June 26, 2003, Verdemare issued an unsatisfactory rating for Yialouris-Papasmiras for the 2002-2003 school year.  (Def. Ex. Yialouris Q; Resp. to 56.1 ¶ 183)  In September 2003, Yialouris-Papasmiras was transferred to P.S. 127 pursuant to her May 2003 request.  (Def. Ex. Yialouris B; Resp. to 56.1 ¶ 184)

On October 20, 2003, Pauline Frank, the Principal of P.S. 127, conducted a classroom observation of plaintiff Yialouris-Papasmiras.  (Def. Ex. Yialouris R; Resp. to 56.1 ¶ 185)  In her post-observation letter to Yialouris-Papasmiras afterwards, Frank stated that the lesson plan was inadequate, classroom management was insufficient and the class was a poor learning environment.  (Def. Ex. Yialouris R; Resp. to 56.1 ¶ 185)  Frank rated plaintiff Yialouris-Papasmiras' lesson as unsatisfactory.  (Def. Ex. Yialouris R; Resp. to 56.1 ¶ 185)

Frank suggested several ways in which plaintiff Yialouris-Papasmiras could improve her teaching skills.  (Def. Ex. Yialouris R; Resp. to 56.1 ¶ 185)  Despite these suggestions, Frank observed three other lessons taught by plaintiff Yialouris-Papasmiras during the remainder of the school year and rated them all unsatisfactory.  (Def. Exs. Yialouris T, U, V; Resp. to 56.1 ¶¶ 187-89)  In June 2004, Yialouris-Papasmiras received an unsatisfactory rating for the 2003-2004 school year.  (Def. Ex. Yialouris W; Resp. to 56.1 ¶ 190)


2. <u>Elizabeth DeMairo-Stingo's Claims</u>

a. <u>Discrimination</u>

In moving for summary judgment on plaintiff DeMairo-Stingo's claim of age discrimination, defendants argue that she has failed to come forward with evidence that she suffered adverse employment action.  (Def. Mem. at 10-11)  Specifically, defendants argue that, at most, DeMairo-Stingo was given the choice of transferring from P.S. 112 to P.S. 48.  (Def. Mem. at 11, citing Reiskin Dep. at 75)  Since this transfer involved no loss in salary or diminished benefits or responsibilities, defendants contend that it was a lateral transfer and thus not an adverse employment action.  (Def. Mem. at 11)  In response, plaintiffs argue that this transfer was not voluntary and that it meant the loss of "building seniority," which, in turn, caused the loss of "certain employment entitlements."  (Pl. Mem. at 10-11)

Based on the evidence in the record, no reasonable jury could conclude that plaintiff DeMairo-Stingo's transfer from P.S. 112 to P.S. 48 was involuntary.  DeMairo-Stingo's union representative testified that he had arranged the transfer because DeMairo-Stingo and the other two teachers involved "felt that it would probably be to their best interests not to remain at the school."  (Reiskin Dep. at 75)  In responding to defendants' statement of facts as required by Local Rule 56.1, plaintiffs conceded that DeMairo-Stingo was "given the option of transferring out of P.S. 112."  (Resp. to 56.1 ¶ 166)  In support of their argument that this transfer was not

voluntary, plaintiffs cite the deposition testimony of DeMairo-Stingo in which she testified that Reiskin had told her that defendant Verdemare was "coming after" her and advised her to transfer.  (Pl. Mem. at 10, citing DeMairo-Stingo Dep. at 88)  However, there is no evidence that any disciplinary charges had been considered, let alone initiated, against DeMairo-Stingo regarding the bus incident.  Despite having the opportunity to supplement their opposition to defendants' motion with supporting evidence, plaintiffs have failed to come forward with evidence – not merely assertions or conjecture – to dispute defendants' evidence that the transfer was voluntary.

Viewing the evidence in the record most favorably to plaintiffs, plaintiff DeMairo-Stingo elected to transfer rather than remain in a work environment where her superior had concluded that she had used poor judgment and placed students at risk.  See Pellier v. British Airways, PLC, 2006 WL 132073, *15 (E.D.N.Y. Jan. 17, 2006) (granting summary judgment where there was no evidence that the employer "intentionally created conditions so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to accept the transfer").  Given such facts, no reasonable jury could find that plaintiff DeMairo-Stingo suffered an adverse employment action.  Cf. Silverman, 216 F.Supp.2d at 115-16 (holding that an employee is not constructively discharged when he resigns rather than respond to disciplinary charges); Stembridge, 88 F.Supp.2d at 284-85 (same).

True, the Second Circuit has recognized that a transfer may, in certain circumstances, constitute an adverse employment action, even if requested by the plaintiff.  See Richardson v. N.Y. State Dep't of Corr. Servs., 180 F.3d 426, 444 n.4 (2d Cir. 1999), abrogated on other grounds, Burlington Northern, 126 S. Ct. at 2405.  In Richardson, however, there was evidence that the plaintiff was qualified for – but was not offered – a more desirable, lateral position that was open at the time of her transfer.  Id.  Plaintiffs have come forward with no evidence that more desirable position for which she was qualified was available, but not

disclosed, to DeMairo-Stingo.  In the absence of such evidence, other courts have routinely

granted or affirmed grants of summary judgment in favor of defendants.  See, e.g., Simpson v.

Borg-Warner Auto., Inc., 196 F.3d 873, 876-78 (7th Cir. 1999) (applying "constructive

discharge" analysis to hold that voluntary transfer was not an adverse employment action where

the work environment was not intolerable); Pellier, 2006 WL 132073 at *4 ("It is clear that

Pellier's transfer cannot serve as an adverse employment action because she voluntarily

requested and accepted it.").  I note that, in Richardson, the Court observed that an employee's

request to be transferred may be a legitimate, nondiscriminatory reason for the transfer.  180 F.3d

at 444 n.4.

Even if the plaintiffs had come forward with evidence from which a reasonable

jury could conclude that plaintiff DeMairo-Stingo's transfer was involuntary, there is no

evidence that the transfer resulted in "significantly diminished material responsibilities, or other

indices . . . unique to a particular situation."  Galabya, 202 F.3d at 640.  "'[I]f a transfer is truly

lateral and involves no significant changes in an employee's conditions of employment, the fact

that the employee views the transfer either positively or negatively does not of itself render the

denial or receipt of the transfer [an] adverse employment action.'"  Fairbrother, 412 F.3d at 56

(quoting Williams, 368 F.3d at 128).

In opposing defendants' motion, plaintiffs argue that a loss in "building seniority"

jeopardized DeMairo-Stingo's influence in "picking certain classes . . . ; being on committees;

having input into students' graduation activities, etc."  (Pl. Mem. at 11)  Plaintiffs have come

forward with no evidence that plaintiff DeMairo-Stingo actually experienced any diminished

influence in this or any other regard.  DeMairo-Stingo testified that the transfer did not affect her

salary and she was not aware of any negative letters being placed in her file after the transfer.

(DeMairo-Stingo Dep. at 92-93)  Despite having the opportunity to supplement their submissions

in opposition to defendants' motion, plaintiffs have failed to come forward with any evidence

that this transfer caused any "significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  <u>Galabya</u>, 202 F.3d at 640.  No reasonable jury could conclude that DeMairo-Stingo suffered an adverse employment action due to this transfer.

Plaintiffs have failed to come forward with any evidence from which a reasonable jury could conclude that they have satisfied either the third or fourth prongs of a prima facie case of age discrimination against plaintiff DeMairo-Stingo.  Summary judgment is granted to defendants with regard to this claim.

b.  <u>Retaliation</u>

In moving for summary judgment on plaintiff DeMairo-Stingo's ADEA retaliation claim, defendants argue that plaintiffs have failed to come forward with any evidence that DeMairo-Stingo suffered an adverse employment action after she filed her EEOC charge on September 26, 2002.  (Def. Mem. at 11)  In opposing summary judgment, plaintiffs argue that DeMairo-Stingo first engaged in protected activity as early as spring 2002 as a member of the P.S. 112 Consultation Committee.  (Pl. 7/24/06 Supp. Mem. at 11-12)  According to plaintiffs, DeMairo-Stingo "verbally presented complaints on behalf of the school's teachers[,] including Ms. Yialouris, to Defendant Verdemare."  (<u>Id.</u> at 11)  However, plaintiffs do not argue that any of these complaints pertained to age-related discrimination.  Rather, plaintiffs only argue that these complaints included those involving "the condescending tone and beratement by Defendant Verdemare" and "a problem child in the school."  (<u>Id.</u>)  There is no evidence in the record to support any claim that the complaints presented to the Committee and then Verdemare involved age-related bias.  Plaintiffs have come forward with no evidence of DeMairo-Stingo engaging in any activity protected by the ADEA other than the filing of the September 26, 2002 charge with the EEOC.  Moreover, there is no evidence in the record that DeMairo-Stingo suffered any adverse employer action after she filed her EEOC charge.  (Def. Ex. DeMairo-Stingo A at 1;

Resp. to 56.1 ¶ at 175)  To the contrary, DeMairo-Stingo testified that she has a high opinion and

good working relationship with the principal of P.S. 48, defendant Picucci.  (DeMairo-Stingo

Dep. at 86-87)  Based on the evidence in the record, no reasonable jury could conclude that

DeMairo-Stingo experienced any materially adverse employer conduct after she engaged in

protected activity by filing her EEOC charge.  Therefore, summary judgment is granted to

defendants as to DeMairo-Stingo's claim of retaliation under the ADEA.


### 3.   Mary Yialouris-Papasmiras' Claims

#### a.   Discrimination

Plaintiffs assert that the retroactive change in plaintiff Yialouris-Papasmiras'

2001-2002 annual performance rating from satisfactory to unsatisfactory was adverse

employment action motivated by age-related animus.  (Pl. Mem. at 15, citing Def. Ex. Yialouris

D; Pl. 7/24/06 Supp. Mem. at 16-19)  Although plaintiff dispute the specific allegations made by

defendant Verdemare about Yialouris-Papasmiras' actions on the bus trip, they do not dispute

that those alleged actions were the reason why the rating was changed.  (Def. Ex. Yialouris D at

2; Resp. to 56.1 ¶ 173)

Regardless, a negative performance evaluation, without more, is not an adverse

employment action.  Sanders, 361 F.3d at 756 (affirming judgment as a matter of law for

defendant because plaintiff had failed to come forward with any evidence that the evaluation had

any effect on her job conditions); Weeks, 273 F.3d at 86.  Plaintiffs have failed to point to any

evidence that any evaluations of plaintiff Yialouris-Papasmiras had any actual impact on her.

Instead, plaintiffs merely argue that these negative evaluations "deny the teacher[] the ability to

perform per session employment."  (Pl. Mem. at 15)  However, there is no evidence that

Yialouris-Papasmiras was qualified for any available per session positions or that she submitted

an application for such work.  Lacking any evidence that these evaluations had any effect on

Yialouris-Papasmiras' job conditions, no reasonable jury could find that she suffered any adverse employment action.

Even if plaintiff Yialouris-Papasmiras had suffered an adverse employment action, no reasonable jury could infer, based upon the available evidence, that such employer conduct resulted from discriminatory animus on the basis of age.  It is undisputed that defendant Verdemare wrote several negative lesson evaluations for Yialouris-Papasmiras and that Verdemare reprimanded – at least informally – both Yialouris-Papasmiras and DeMairo-Stingo for their behavior on the senior bus trip.  Courts have generally held that an employer's legitimate and constructive criticism of an employee or personal friction between two individuals does not give rise to an ADEA discrimination claim unless there is evidence of discriminatory animus.  See, e.g., Pasha, 2004 WL 188077, at *5; Douglas, 207 F.Supp.2d at 291.  Plaintiffs have failed to come forward with any evidence from which a reasonable jury could infer age discrimination based upon the evidence in the record.

Summary judgment is granted to defendants on plaintiff Yialouris-Papasmiras' claim of age discrimination.

b.  Retaliation

In this case, the only evidence of plaintiff Yialouris-Papasmiras having engaged in any protected activity is her filing a charge with the EEOC on September 26, 2002.  (Def. Ex. Yialouris-Papasmiras A at 1; Resp. to 56.1 ¶ 175)  It is undisputed that Yialouris-Papasmiras received several negative performance evaluations for individual lessons she taught after this date.  (Def. Exs. Yialouris-Papasmiras J, M, P, R, T, U, V; Resp. to 56.1 ¶¶ 177, 179, 182, 185, 187-89)  In addition, Yialouris-Papasmiras received an unsatisfactory rating for the 2003-04 school year at her new school, P.S. 127.  (Def. Ex. Yialouris-Papasmiras W; Resp. to 56.1 ¶ 190)

Plaintiff Yialouris-Papasmiras began receiving negative feedback from defendant Verdemare before she filed her EEOC charge.  See, e.g., Def. Ex. Yialouris-Papasmiras G (fire alarm incident); Def. Ex. Yialouris-Papasmiras D (school bus trip incident).  In addition, Verdemare retroactively changed the annual rating for Yialouris-Papasmiras for the 2001-2002 school year from satisfactory to unsatisfactory two days before Yialouris-Papasmiras filed her EEOC charge, thus precluding a reasonable jury from finding that the filing led her to make the change.  (Def. Ex. Yialouris-Papasmiras I; Resp. to 56.1 ¶ 174)  The Second Circuit has instructed that "where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  Slattery, 248 F.3d at 95.  See also Phillips, 2006 WL 177155, at *4 (granting summary judgment to employer on retaliation claim where termination occurred three months after the filing of an EEOC charge and numerous disciplinary actions predated the filing).  Yialouris-Papasmiras began to receive "gradual adverse job actions" before she engaged in any protected activity.

Moreover, the employer conduct at issue does not rise to the level of adverse employment action.  As noted, one court in this District has rejected the argument that a negative job evaluation, standing alone, meets the Burlington Northern standard.  Jackson, 2006 U.S. Dist. LEXIS 43338 (S.D.N.Y. June 26, 2006).  As in Jackson, plaintiffs here have identified no "evidence in the record that any negative consequences resulted from" the negative evaluations.  Id. at *3.  As noted above, plaintiffs argue that receiving an unsatisfactory annual rating meant that the teacher could not receive "per session" work.  (Pl. 7/24/06 Supp. Mem. at 18)  However, there is no evidence in the record that Yialouris-Papasmiras was otherwise eligible for such work, that such work was available, or that Yialouris-Papasmiras actually applied for and was denied such work.

66

Summary judgment is granted to defendants as to plaintiff Yialouris-Papasmiras' claim of retaliation under the ADEA.

G. Marie Magaldi

1. Discrimination

I addressed plaintiff Marie Magaldi's claims of age discrimination in my earlier opinion in this case. See Carmellino, 2004 WL 736988, at *11-*15. Specifically, I concluded that the continuing violation doctrine does not apply to Magaldi's claims. Id. at *12-*13. Magaldi filed her EEOC charge on August 29, 2002. (Def. Ex. Magaldi A at 1) Therefore, under the 300-day statute of limitations, any claims arising on or after November 2, 2001, are timely and any claims arising before that date are time-barred. See Holowecki, 440 F.3d at 558 (citing 29 U.S.C. §§ 626(d), 633(b)).

The evidence identifies only one event within the limitations period that could give rise to a claim of age discrimination – plaintiff Magaldi's retirement on November 16, 2001. (Magaldi Dep. at 113)  Plaintiffs argue that Magaldi's retirement was not voluntary and that she was constructively discharged.  (Pl. Mem. at 30)  The Second Circuit has held that a constructive discharge claim under the AEDA accrues when the plaintiff gives "definite notice of her intention to retire."  Flaherty, 235 F.3d at 138-39.  On March 28, 2001, a date prior to the limitations period, Magaldi and her attorney signed a stipulation in which she agreed to retire from her employment with defendant DOE and that this retirement would become effective on October 16, 2001.  (Def. Ex. Magaldi M ¶ 1; Resp. to 56.1 ¶ 214)  In my earlier opinion, I considered whether this stipulation provided "definite notice of her intention to retire," given that Magaldi actually retired a month later than the date specified in the stipulation.  See Carmellino, 2004 U.S. Dist. LEXIS 5754, at *14-*15.  At that time, I denied defendants' motion for summary judgment on this claim.  Id. at *15.  In doing so, I stated that "[f]urther factual development will

67

help determine whether the Stipulation constituted an effective communication of Magaldi's intention to resign, or perhaps something less." Id.

Discovery is now closed, and there is no evidence that the March 28, 2001 stipulation is anything other than an effective communication of plaintiff Magaldi's full intention to retire from her job.  In Flaherty, the Second Circuit addressed the question presented here – at which point does an employee's constructive discharge claim arise under the ADEA for purposes of the statute of limitations?  235 F.3d at 137 (noting that the question was one of first impression in the Second Circuit).  The court rejected the defendant's argument that the claim arises as soon as the plaintiff's working conditions become intolerable.  Id. at 138.  Instead, the court held that a constructive discharge claim does not accrue until the employee gives her employer "definite notice of her intention to retire":

> This is essentially the converse of the discriminatory discharge case where the date the employer gives notice of termination to the employee is controlling for purposes of accrual.  In the case of constructive discharge, it is only the employee who can know when the atmosphere has been made so intolerable by the discrimination-motivated employer that the employee must leave . . . .  "The fact that the actual act of terminating employment is initiated by the employee, who concludes that she is compelled to leave as a result of the employer's actions, rather than by the employer directly does not change the fact that the employee has been discharged."

Id. at 138-39 (quoting Draper v. Coeur Rochester, 147 F.3d 1104, 1110 (9th Cir. 1998)).  It was uniquely within Magaldi's personal knowledge when her working atmosphere had become so intolerable that she must leave.  Once Magaldi arrived at that point, she provided definite notice to defendant DOE of her intention to retire.  It was then, on March 28, 2001, a date beyond the 300-day limitations period, that the statute of limitations began to run on Magaldi's claim.

The fact that plaintiff Magaldi's date of actual retirement was different from the specific date contained in her stipulation is of no moment.  The rule articulated in Flaherty does not turn on whether all provisions of an employee's agreement with an employer to retire are performed as originally agreed.  Rather, the Second Circuit focused on the definiteness of the

employee's expression of her intent to retire.  Id. at 138.  In signing the March 28, 2001 stipulation, Magaldi performed, inter alia, two acts: (1) she unilaterally expressed her clear, definite intention to retire, and (2) she agreed with defendant DOE as to the date on which she would retire.  I will assume arguendo that, after this stipulation became effective, Magaldi and the DOE agreed to change Magaldi's retirement date.[2]  There is no evidence that, in the almost eight months between Magaldi's signing the stipulation and her actual retirement, Magaldi expressed to any defendant the desire to cancel her planned retirement and continue working for DOE.  The fact that one or more defendant allowed Magaldi to work a month beyond the date originally set is nothing more than a mutual modification of the original agreement.  In agreeing to this modification, Magaldi never altered her definite intention – originally expressed in the March 28, 2001 stipulation – to retire from her position with DOE.

As plaintiff Magaldi signed the stipulation prior to the 300-day period preceding her filing an EEOC charge, her discrimination claim based upon her alleged constructive discharge is barred by the AEDA statute of limitations.  Id. at 139.  Summary judgment is granted to defendants on Magaldi's claim of age discrimination.

## 2.  Retaliation

Plaintiff Magaldi retired approximately nine months prior to filing her EEOC charge, and there is no evidence of her having engaged in any other activity protected by the ADEA.  (Magaldi Dep. at 113; Def. Ex. Magaldi A at 1)  There is no evidence of Magaldi having experienced an adverse employer action after filing her EEOC charge.  Therefore, summary judgment is granted to defendants on Magaldi's retaliation claim.

---

[2] On October 16, 2001, plaintiff Magaldi submitted her application for retirement.  (Def. Ex. Magaldi S; Resp. to 56.1 ¶ 218)  On November 16, 2001, Magaldi actually retired from her job with defendant DOE.  (Magaldi Dep. at 113; Resp. to 56.1 ¶ 219)  For purposes of defendants' motion, I will assume favorably to the non-movant that Paragraph 1 of the March 28, 2001 stipulation specified October 16, 2001 as the date of Magaldi's actual retirement, not the date that she would file her application for retirement.  (Def. Ex. Magaldi N)

H.  Barbara Pocino

Plaintiff Pocino was born in 1947 and began working for defendant DOE in September 1988 at P.S. 189.  (Def. Exs. Pocino A, B; Resp. to 56.1 ¶ 222)  During the relevant period, Pocino was employed as a tenured teacher at P.S. 176K.  (Def. Ex. Pocino B; Resp. to 56.1 ¶ 222)

Plaintiff Pocino testified that, in October 2001, she fell and hit her head on the leg of a table and suffered a head injury.  (Pocino 11/29/04 Dep. at 66)  Although she was advised to go to the hospital, Pocino testified that she did not do so because she does not like hospitals.

(Id.)  Pocino went to school the next day and met defendant Margaret De Gaeta, the Principal of P.S. 176K.  (Id. at 68)  In her deposition, Pocino testified:

> A.  . . . When I came in [to work,] Mrs. DeGaeta was at the front door.  She saw that I had a head injury, and she said to me, [y]ou could have a concussion.  You should go home.
>
> Q.  Is there any reason why she told you this?
>
> A.  She saw the injury on the top of my head.  There was a big hole on the top of my head . . . .

(Id.)  After returning to school, Pocino began to notice things missing from her home and office.

In her deposition, Pocino testified:

> [M]y desk just wasn't the same way that I left it from day-to-day.  It seemed to me that someone was going through my things.  In addition to that, the tires on my car had been slashed four times that year, and my car was broken into that year, and the following year.  The following year personal things were stolen from the car; a leather jacket.  Some other things that were in the trunk.

(Id. at 48-49)  Pocino testified that she reported her observations to De Gaeta:

> I told Mrs. DeGaeta that I was afraid for my own safety, because my keys had gone missing, and since things were missing in my classroom and my car was vandalized, maybe my home would be next, and I said to her maybe it already had happened.  I have a pen here.  I thought I left this pen at home, but it's in my desk. So, I said that.

(Id. at 83)

On October 25, 2001, defendant De Gaeta wrote to defendant Grippo requesting a medical examination of plaintiff Pocino pursuant to Section 2568 of the New York State Education Law.  (Def. Exs. Pocino H, I; Resp. to 56.1 ¶ 229)  In this correspondence, De Gaeta asserted that Pocino "had acted erratically over the past several days" and had made "unusual statements."  (Def. Ex. Pocino I; Resp. to 56.1 ¶ 229)  Specifically, De Gaeta wrote:

> Ms. Pocino has repeated unconfirmed claims that items are missing from her locked closets.  She further states that items have been removed from her home and have been brought to school by persons unknown.  This is an undocumented claim.

(Def. Ex. Pocino I)

On October 26, 2001, defendant Grippo wrote a memorandum to Yvonne Joseph, the Administrator of defendant DOE's Medical Bureau, to direct the Bureau to conduct a medical examination of Pocino.  (Def. Ex. Pocino J; Resp. to 56.1 ¶ 230)  On October 31, 2001, De Gaeta wrote a letter to Joseph in which she detailed the behavior of Pocino during the previous several days.  (Def. Ex. Pocino K; Resp. to 56.1 ¶ 231)  In the letter, De Gaeta repeated her statements about Pocino's claims to have items stolen and also stated that Pocino had, "on several occasions[,] called in excessively late to say that she would not be coming to school."  (Def. Ex. Pocino K; Resp. to 56.1 ¶ 231)  Pocino testified that, on or about November 3, 2001, De Gaeta informed her that she should be examined by the Medical Bureau.  (Pocino 11/29/04 Dep. at 74)  After that date, De Gaeta wrote to Pocino twice about Pocino's absences from work.  (Def. Exs. Pocino L, N; Resp. to 56.1 ¶¶ 232, 234)

On November 16, 2001, plaintiff Pocino appeared at defendant DOE's Medical Bureau for an examination conducted by Dr. Audrey Jacobson.  (Def. Ex. Pocino P; Resp. to 56.1 ¶ 235)  According to the examining physician's notes, Pocino told her that "things [were] being mysteriously moved around or missing or move[d] from her home to school [and] vice versa.  She reports that over the past 2-3 months she has noticed things missing from her home

71

and has heard 'strange noises' as if someone's in the house."  (Def. Ex. Pocino P; Resp. to 56.1 ¶

235)  The examining physician concluded that Pocino was suffering from paranoid delusions and

was "not fit at present" to return to work.  (Def. Exs. Pocino P, Q; Resp. to 56.1 ¶¶ 235-36)  As a

result, Pocino was not allowed to return to teaching at P.S. 176K for an unspecified period.

(Pocino 11/29/04 Dep. at 98-99)  Pocino testified that, during the period following this

examination when she was not working, defendant DOE deducted approximately 40-50 days

from her accumulated sick time.  (Pocino 12/8/04 Dep. at 96-97)

       As a result of the November 16, 2001 examination by Dr. Jacobson, plaintiff

Pocino was scheduled to have a second examination on January 9, 2002 by Richard Shuster,

Ph.D., a psychologist employed by defendant DOE.  (Def. Ex. Pocino T; Resp. to 56.1 ¶ 239)

Plaintiff told Dr. Shuster that she had suffered a head injury in October 2001 and that her

physician told her that she may have had a seizure.  (Def. Ex. Pocino T; Resp. to 56.1 ¶ 239)  It

is undisputed that plaintiff never had a neurological consultation after suffering the head injury.

(Def. Ex. Pocino T; Resp. to 56.1 ¶ 239)  After preparing a psychological evaluation of plaintiff

Pocino (Def. Ex. Pocino T), Dr. Shuster wrote to defendant DOE's Medical Division and

defendant Grippo to inform them that he found Pocino was fit to return to service.  (Def. Exs.

Pocino U; Resp. to 56.1 ¶¶ 240-41)  Pocino returned to work at P.S. 176K on January 31, 2002.

(Def. Ex. Pocino V; Resp. to 56.1 ¶ 242)

       On February 6, 2002 and March 6, 2002, plaintiff Pocino did not attend

mandatory faculty conferences at P.S. 176K.  (Pocino 12/8/04 Dep. at 67; Def. Ex. Pocino W;

Resp. to 56.1 ¶¶ 243, 245)  On April 16, 2002, Pocino learned from her students that one student

had a box-cutter at school.  (Pocino 12/8/04 Dep. at 42; Def. Ex. Pocino X; Resp. to 56.1 ¶ 246)

Shortly thereafter, Pocino went to the main office of P.S. 176K, but neither defendant De Gaeta

nor defendant Assistant Principal Elizabeth Culkin were in the office.  (Def. Ex. Pocino X; Resp.

to 56.1 ¶ 246)  It is undisputed that Pocino then went home without informing anyone else –

including the secretaries in the main office or the school security guard – about the box-cutter.
(Def. Ex. Pocino X; Resp. to 56.1 ¶ 246)

On May 29, 2002, plaintiff Pocino's attorney wrote to defendant Grippo
informing him that he had been retained by Pocino and explaining the nature of Pocino's
allegations.  (Pl. Ex. SS)  Although this letter details several examples of defendant De Gaeta's
alleged "harassing conduct," there is no reference to Pocino's age or any discriminatory animus
on the part of De Gaeta.  (Id.)  In addition, the attorney requested, on behalf of Pocino, that she
be transferred to an elementary school on Staten Island.  (Id.)  There is no evidence in the record
as to what effect this letter had on Pocino's employment.  On June 18, 2002, Pocino received a
satisfactory rating for her 2001-2002 annual performance evaluation.  (Def. Ex. Pocino Z; Resp.
to 56.1 ¶ 248)  Pocino filed her EEOC charge on September 18, 2002.  (Def. Ex. Pocino A at 1;
Resp. to 56.1 ¶ 249)  There is no other evidence in the record regarding Pocino's employment by
defendant DOE since that date.

1.  <u>Discrimination</u>

In moving for summary judgment, defendants argue that the statute of limitations
bars any of plaintiff Pocino's claims that arose before November 22, 2001, <u>i.e.</u> more than 300
days before the September 18, 2002 filing of charges with the EEOC.  (Def. Mem. at 16)
Specifically, defendants argue that the following assertions are time-barred: Pocino's allegation
that, in April 2000, she had applied, but was not hired, for a reading teacher position and her
claim that, on November 16, 2001, she was wrongfully removed from her teaching duties.  (Id.)

Plaintiffs have come forward with no evidence that the facts surrounding Pocino's
alleged application for a reading teacher position in April 2000 was part of a continuing practice
or policy on the part of any defendant.  Therefore, this claim is barred by the statute of
limitations.

It is a closer question whether the statute of limitations bars plaintiff Pocino's discrimination claim based upon her November 16, 2001 removal from classroom duties. Plaintiffs argue that this claim did not arise until January 9, 2002, the date on which Pocino received a second medical examination and the examining physician concluded that Pocino was fit to return to duty.  (Id.)  It was only then, plaintiffs argue, that Pocino "discovered the initial DOE evaluation was bogus and she was in fact fit to continue teaching."  (Id.)  In response, defendants direct this Court to Harris v. City of N.Y., 186 F.3d 243, 247 (2d Cir. 1999), which holds that the statute of limitations for claims under the ADA, the Rehabilitation Act and the Fourteenth Amendment begins to run once the plaintiff "knows or has reason to know of the injury serving as the basis of his claim."  (Def. Repl. Mem. at 13)  Defendants argue that Pocino "knew on November 16, 2001, that she was being removed from her teaching position because she was medically unfit for duty."  (Id.)  Thus, defendants contend that any claim arising from her removal from teaching duties is time-barred.  (Id.)

The statute of limitations for ADEA claims ordinarily begins to run "on the date the allegedly discriminatory decision was made and communicated to the employee" – i.e., the day on which the employee receives "definite notice" of the unlawful act.  Economu v. Borg-Warner Corp., 829 F.2d 311, 315 (2d Cir. 1987) (citing Delaware State Coll. v. Ricks, 449 U.S. 250 (1980)).  However, in affirming a grant of summary judgment for an employer on a wrongful discharge claim brought under the ADEA, the Second Circuit recognized that the statute of limitations should be tolled in certain circumstances.  See Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20, 24 (2d Cir. 1985), cert. denied, 474 U.S. 851 (1985).  The court stated:

> The foregoing time periods commence upon the employer's commission of the discriminatory act and are not tolled or delayed pending the employee's realization that the conduct was discriminatory unless the employee was actively misled by his employer, he was prevented in some extraordinary way from exercising his rights, or he asserted his rights in the wrong forum, in which event tolling of the time bar might be permitted as a matter of fairness.  An "extraordinary" circumstance permitting tolling of the time bar on equitable

74

> grounds might exist if the employee could show that it would have been
> impossible for a reasonably prudent person to learn that his discharge was
> discriminatory.

Id. (citing Smith v. Am. President Lines, Ltd., 571 F.2d 102, 109 (2d Cir. 1978).  Here, plaintiff

Pocino testified that employees of defendant DOE informed her on November 16, 2001, that she

would receive a second medical examination at a then-unspecified future date.  (Pocino 11/29/04

Dep. at 98)  On November 29, 2001, a date within the limitations period, Joseph, the Medical

Bureau Administrator, wrote to Pocino to inform her of her second examination date.  (Def. Ex.

Pocino R)  Viewed most favorably to the non-movant, it was only on November 29, 2001 that

Pocino received "definite notice" that she would be not allowed to work until she underwent the

second medical examination.  Economu, 829 F.2d at 315.  I conclude that Pocino's claim based

upon defendant DOE's conclusion that she was medically unfit for duty either arose during the

limitations period, or, in the alternative, should be equitably tolled to a date within that period.

        Nevertheless, defendants have come forward with evidence of a legitimate,

nondiscriminatory reason for the allegedly adverse employment action.  It is undisputed that

plaintiff Pocino suffered a significant head injury, received advice to go to a hospital, did not go

to a hospital, and instead went to work the next day.  (Pocino 11/29/04 Dep. at 66)  Pocino

testified, in detail, about her post-injury suspicions that someone had removed things from her

office and home and sometimes from one place to the other.  (Id. at 48-49)  Pocino shared her

suspicions with defendant De Gaeta and told her that she was "afraid for [her] own safety."  (Id.

at 83)  Under the circumstances, it was entirely reasonable for De Gaeta to require Pocino – a

teacher responsible for the safety and well-being of dozens of children – to submit to a medical

examination.  The first examination by Dr. Jacobson concluded that she was medically unfit for

the classroom.  Defendants have met their burden of producing evidence of their legitimate,

nondiscriminatory reasons for barring her from the classroom until receiving the results of the

second medical examination.

Plaintiffs have come forward with no evidence that defendants' legitimate, nondiscriminatory reasons for this conduct are pretextual.  Plaintiffs identify two statements that they assert show pretext.  (Pl. Mem. at 28-29; Pl. 7/24/06 Supp. Mem. at 27-28)  First, plaintiff Pocino testified that defendant De Gaeta had told her, "Mr. Grippo sends me lists of people he wants me to get rid of."  (Pocino 11/29/04 Dep. at 118)  Second, Pocino testified that defendant Culkin had told her, "I can't take Grippo anymore.  He wants to get rid of the older teachers who came in."  (Pocino 12/8/04 Dep. at 87-88)  In the context of the pretext prong of the <u>McDonnell Douglas</u> framework, these statements – without more – are stray remarks and insufficient for Pocino to meet her burden.  <u>See</u> <u>Danzer</u>, 151 F.3d at 56.  No reasonable jury could conclude, based upon these statements above, that defendants' legitimate, nondiscriminatory reason for barring Pocino from the classroom based upon the first medical examination conducted by Dr. Jacobson was pretextual.

Plaintiff Pocino also asserts that negative letters placed in her file during the limitations period were adverse employment actions.  Specifically, these letters addressed Pocino's failure to attend faculty conferences (Pl Exs. Pocino P, W), failure to report a student who brought a box-cutter to school (Pl. Ex. Pocino X) and a lesson given on May 21, 2002 (Pl. Ex. Pocino Y).  Plaintiffs argue that these letters are a "permanent record" that prevents Pocino "from advancing as a guidance counselor and/or transferring to another school."  (Pl. Mem. at 28, citing Pocino Dep. at 80-81)  When asked about the actual effect of these letters during her deposition, however, Pocino testified that defendant De Gaeta "encouraged [her] to apply for a guidance counselor position repeatedly."  (Pocino Dep. at 81)  However, Pocino did not do so "because I cannot go into another school with these letters in my file."  (<u>Id.</u>)  In Pocino's view, "[n]o one [was] going to hire [her] with these letters in [her] file."  (<u>Id.</u>)  If there were evidence that these letters hindered Pocino from obtaining a different position, it might raise an issue of fact of whether they amounted to adverse employment actions.  <u>See</u> <u>Fairbrother</u>, 412 F.3d at 56

76

(holding that a prima facie case of discrimination requires evidence of a "materially adverse change in the terms and conditions of employment" (internal quotations omitted)).  Instead of coming forward with such evidence, plaintiffs rest their discrimination claim on Pocino's speculation as to what would likely have happened if she had sought a different position. Conjecture or speculation is insufficient to resist a motion for summary judgment.  Kulak, 88 F.3d at 71.  The discovery period in this case was more than ample for plaintiffs to have uncovered such evidence if there had been any.

Summary judgment is granted as to plaintiffs' claim of age discrimination suffered by plaintiff Pocino.

### 2.  Retaliation

In moving for summary judgment on plaintiff Pocino's ADEA retaliation claim, defendants argue that plaintiffs have failed to come forward with any evidence that Pocino suffered adverse employment action after she filed her EEOC charge on September 18, 2002. (Def. Mem. at 18)  In opposing summary judgment, plaintiffs do not address this assertion.  (Pl. Mem. at 27-29)

"[A]n individual has engaged in protected activity if he 'has opposed any practice made unlawful by this section' or has 'participated in any manner in an investigation, proceeding, or litigation under this chapter.'"  Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564, 1569-1570 (2d Cir. 1989) (quoting 29 U.S.C. § 623(d)).  For Title VII claims, the Second Circuit has repeatedly held that informal, as well as formal, complaints about unlawful discrimination constitute protected activity.  Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990).  Moreover, district courts have applied this principle to the similarly worded retaliation provision for the ADEA contained in § 623(d).  See, e.g., Khan v. HIP Centralized Lab. Servs., 2006 WL 842916, *3, *10 (E.D.N.Y. Mar. 27, 2006) (denying summary judgment

on retaliation claim to employer due to evidence that employee, prior to his suspension, spoke with supervisor about alleged age discrimination and told supervisor that he "was going to take action," thereby engaging in protected activity); <u>Booker v. Fed. Reserve Bank of N.Y.</u>, 2003 WL 1213148, *9 (S.D.N.Y. Mar. 17, 2003).

   Here, plaintiff Pocino's attorney wrote to defendant Grippo on May 29, 2002 to inform him that Pocino sought a transfer to a different school and the reasons why Pocino was seeking this action.  (Pl. Ex. SS)  The letter makes no reference to the ADEA or even to age discrimination, but it does complain about defendant De Gaeta's "harassing conduct" and recites some of the factual allegations relevant to this claim.  (<u>Id.</u>)  In <u>Grant</u>, the Second Circuit held that a reasonable jury could find that the employee had engaged in protected activity by refusing to destroy a letter signed by the company president in which he stated that he sought a "young man . . . between 30 and 40 years old" for a position.  880 F.2d at 1567, 1569-70 (reversing the district court's grant of judgment n.o.v. for the employer on employee's retaliation claim).  Viewed most favorably to the non-movant, a reasonable jury could conclude that Pocino, through her attorney's letter, was acting under a "reasonable, good faith belief" that a violation of discrimination laws had occurred, was working to oppose such a violation and was therefore engaging in protected activity.

   Assuming, for purposes of defendants' motion, that this letter constituted protected activity, there is no evidence that plaintiff Pocino experienced any adverse employer conduct after its transmittal to defendant Grippo.  The only evidence in the record is that Pocino received a satisfactory rating for the 2001-02 school year on June 18, 2002, approximately three weeks after sending the letter to Grippo.  (Def. Ex. Pocino Z; Resp. to 56.1 ¶ 248)  Despite having the opportunity to supplement the record, plaintiffs have failed to come forward with any evidence that Pocino experienced any other employer conduct – adverse or otherwise – at any later point.  Such a lack of evidence compels summary judgment in favor of the defendants.

Summary judgment is granted to defendants on plaintiff Pocino's retaliation claim.

I.   <u>Katherine Weber-Wolf</u>

Plaintiff Katherine Weber-Wolf was born in 1949 (Def. Ex. Weber-Wolf A; Resp. to 56.1 ¶ 250), and, during the limitations period, she worked as a tenured teacher at P.S. 102 (Def. Ex. Weber Wolf B; Resp. to 56.1 ¶ 250).

On October 26, 2001, defendant Theresa Dovi, the Principal of P.S. 102, observed plaintiff Weber-Wolf's classroom presentation and evaluated it as unsatisfactory because she had failed to follow the lesson plan.  (Def. Ex. Weber-Wolf M; Resp. to 56.1 ¶ 261)  Subsequently, on November 28, 2001, Assistant Principal Reka Monoki observed Weber-Wolf's classroom lesson and evaluated it as unsatisfactory because the "aim" of the lesson was not achieved, there was no sequential development of skills and the lesson did not engage all of the students.  (Def. Ex. Weber-Wolf N; Resp. to 56.1 ¶ 262)  Monoki placed a negative performance evaluation in Weber-Wolf's file after observing Weber-Wolf talking on a telephone for 15 minutes of her class period on December 14, 2001.  (Def. Ex. Weber-Wolf O; Resp. to 56.1 ¶ 263)  Dovi wrote a negative performance evaluation of Weber-Wolf's classroom presentation on January 30, 2002, and Monoki wrote another negative evaluation based upon Weber Wolf's April 29, 2002 lesson. (Def. Exs. Weber-Wolf Q, S; Resp. to 56.1 ¶¶ 265, 274)

In the first half of 2002, plaintiff Weber-Wolf met with staff developers employed by defendant DOE on several occasions in an effort to improve her teaching.  (Def. Exs. Weber-Wolf P, YY; Resp. to 56.1 ¶¶ 264, 266-68, 270-72)  On May 23, 2002, the DOE's Office of Legal Services ("OLS") held a Technical Assistance Conference regarding Weber-Wolf's teaching.  (Def. Ex. Weber-Wolf T; Resp. to 56.1 ¶ 275)  Based on this conference and the

record of her teaching, the OLS decided on or before May 28, 2002, to pursue charges of incompetence against Weber-Wolf.  (Def. Ex. Weber-Wolf T; Resp. to 56.1 ¶ 275)

On June 14, 2002, defendant Dovi issued an unsatisfactory performance evaluation for plaintiff Weber-Wolf for the 2001-2002 school year.  (Def. Ex. Weber-Wolf V; Resp. to 56.1 ¶ 277)  On June 19, 2002, Neal Opromalla, a Special Assistant to defendant Grippo, observed Weber-Wolf's lesson and rated it unsatisfactory.  (Def. Ex. Weber-Wolf U; Resp. to 56.1 ¶ 276)  Weber-Wolf filed her EEOC charge on July 19, 2002.  (Def. Ex. Weber-Wolf A; Resp. to 56.1 ¶ 278)

On August 30, 2002, defendant Grippo notified plaintiff Weber-Wolf by letter that she would be reassigned to the District 20 Office, effective September 3, 2002.  (Def. Ex. Weber-Wolf W; Resp. to 56.1 ¶ 279)  Weber-Wolf was informed that this reassignment would continue while disciplinary action against her was pending.  (Id.)  On September 30, 2002, Weber-Wolf was served with disciplinary charges for insubordination, neglect of duty, conduct unbecoming a teacher, and unfitness; her actions and inaction were alleged to be "just cause" for termination.  (Def. Ex. Weber-Wolf X; Resp. to 56.1 ¶ 281)

In November 2002, an arbitration proceeding was commenced to adjudicate the disciplinary charges.  (Def. Ex. Weber-Wolf Y; Resp. to 56.1 ¶ 282)  On May 14, 2003, the arbitrator issued a decision in which he found plaintiff Weber-Wolf guilty of seven specifications, fined her $5,000 and ordered her transferred to another district.  (Def. Ex. Weber-Wolf Z; Resp. to 56.1 ¶ 283)  On September 8, 2003, Weber-Wolf was assigned to P.S. 177 in District 21.  (Def. Ex. Weber-Wolf AA; Resp. to 56.1 ¶ 284)

1.  Discrimination

In moving for summary judgment, defendants argue that the ADEA statute of limitations bars any claims asserted by plaintiff Weber-Wolf that arose before September 22,

2001, which was 300 days before she filed her EEOC charge on July 19, 2002.  (Def. Mem. at 20)  Prior to this date, Weber-Wolf received numerous negative lesson evaluations and a "U" rating for the 1997-98 and 2000-01 school years.  (Def. Weber-Wolf Exs. C, D, F, G, H, I, J, K, L; Resp. to 56.1 ¶¶ 251-52, 254-60)  There is no evidence in the record from which a reasonable jury could find the existence of a continuing practice or policy of any defendant.  Accordingly, those portions of Weber-Wolf's claim that arose before September 22, 2001 are time-barred.  However, evidence of facts prior to that date may still serve as relevant "background evidence" to her claim.  See Jute, 420 F.3d at 176-77.

As noted, negative evaluations, without more, are not adverse employment actions.  Sanders, 361 F.3d at 756.  However, the decision by defendant DOE to reassign plaintiff Weber-Wolf to the district office and to pursue charges of incompetence based upon those evaluations may constitute an adverse employment action.

Defendants assert that there is no evidence in the record from which a reasonable jury could infer that such adverse action resulted from discriminatory animus.  In opposing defendants' motion, plaintiffs identify two statements from Weber-Wolf's deposition that they claim illustrate the discriminatory animus of defendants.  (Pl. Mem. at 35)  Specifically, defendant Dovi allegedly told Weber-Wolf that "she looks good for her age" and that Weber-Wolf "should stay home" due to her asthma and knee trouble.  (Wolf Dep. at 127)  At most, these are "isolated and ambiguous" comments from which no reasonable jury could infer discriminatory animus.  See, e.g., Pasha, 2004 WL 188077, at *5; Douglas, 207 F.Supp.2d at 291.  In addition, Weber-Wolf testified that she generally "was being treated differently from other teachers," but this statement referred only to negative performance evaluations and does not reflect any age-related animus.  (Wolf Dep. at 133-35)  Plaintiffs have come forward with no evidence that any defendant sought to pursue charges of incompetence against Weber-Wolf but not against other younger teachers with similar levels of unsatisfactory classroom performance.

Summary judgment is granted to defendants on plaintiff Weber-Wolf's

discrimination claim.


2.  Retaliation

It is undisputed that plaintiff Weber-Wolf filed her charge of age discrimination

with the EEOC on July 19, 2002.  (Def. Ex. Weber-Wolf A; Resp. to 56.1 ¶ 278)  Weber-Wolf

was notified of the decisions to transfer her to the district office and to pursue charges of

incompetence against her on August 30, 2002.  (Def. Ex. Weber-Wolf W; Resp. to 56.1 ¶ 279)

From this chronology, plaintiff argues that adverse employment action was taken in response to

her protected activity.  Here, defendants have come forward with evidence that these decisions

were reached, at the latest, on May 28, 2002.  (Def. Ex. Weber-Wolf T)  Specifically, this

evidence consists of an e-mail message sent on that date from Theresa Europe, the Deputy

Counsel to the Chancellor of Education, to Neal Opromalla, a Special Assistant to defendant

Grippo, regarding plaintiff Weber-Wolf.  (Id.)  The message stated:

> This is to confirm that based on the information received at the Technical
> Assistance Conference (TAC) held on May 23, 2002, the Office of Legal Services
> will be proceeding against Ms. Weber-Wolff on the charges of incompetence.
>
> . . . Ms. Weber-Wolff is to remain in her assignment until the end of the school
> year, rated U in June and reassigned to the District in September in anticipation of
> 3020-a charges.

(Id.)  Despite having the full opportunity to conduct discovery, plaintiffs have come forward with

no evidence that the decision to transfer and charge her was made after she filed her EEOC

charge.  The evidence that the decision was made before she engaged in protected activity is

unrebutted.  Viewing the facts in a light most favorable to plaintiffs, defendants decided to

transfer Weber-Wolf and pursue charges of incompetence against her approximately six weeks

before she filed her EEOC charge.  There is no evidence of Weber-Wolf engaging in any other

protected activity.  No reasonable jury could conclude that there existed a causal connection

between the protected activity and the adverse employment action.  See Clark County Sch. Dist.,
532 U.S. at 272 (holding that, for purposes of a Title VII retaliation claim, an employer's
"proceeding along lines previously contemplated, though not yet definitively determined, is no
evidence whatever of causality"); Buompane, 2002 WL 603036, at *15-*16 (granting summary
judgment to employer where request for employee's termination predated his protected activity
by six weeks).  Weber-Wolf's retaliation claim fails as a matter of law.

Summary judgment is granted to defendants on plaintiff Weber-Wolf's retaliation
claim.


J.   Ellen O'Leary

Plaintiff Ellen O'Leary was born in 1944.  (Def. Ex. O'Leary A; Resp. to 56.1 ¶
285)  During the relevant period, O'Leary worked as a special education teacher at P.S. 104.
(Def. Ex. O'Leary B; Resp. to 56.1 ¶ 285)

In the fall of 2001, defendant DOE's Office of Special Investigations ("OSI")
examined allegations that plaintiff O'Leary inappropriately had marked as absent from class over
120 students.  (Def. Ex. O'Leary G; Resp. to 56.1 ¶ 304)  On October 19, 2001, while the OSI
investigation was pending, O'Leary was reassigned from her teaching duties to the district office.
(O'Leary Dep. at 18, 230)  On October 31, 2001, O'Leary was reassigned to the Committee on
Special Education ("CSE"), a division within the DOE.  (O'Leary Dep. at 230)  On November
26, 2001, defendant Grippo wrote to O'Leary regarding the results of the OSI investigation.
(Def. Ex. O'Leary N; Resp. to 56.1 ¶ 309)  Specifically, Grippo informed O'Leary that the
investigation had concluded that O'Leary "knowingly engaged in theft of services by
misrepresenting information on official Board of Education documents."  (Def. Ex. O'Leary N;
Resp. to 56.1 ¶ 309)  The letter recited that O'Leary had presented her rebuttal to Grippo.  (Def.
Ex. O'Leary N; Resp. to 56.1 ¶ 309)

83

On January 8, 2002, defendant Grippo initiated disciplinary proceedings against plaintiff O'Leary on the grounds of incompetence, insubordination, conduct unbecoming a teacher and neglect of duty.  (Def. Ex. O'Leary O; Resp. to 56.1 ¶ 311)  After meeting with her union-provided attorney on several occasions (O'Leary Dep. at 232, 244), O'Leary signed a settlement agreement with defendant DOE on March 7, 2002.  (Def. Ex. O'Leary P; Resp. to 56.1 ¶ 316)  This agreement recited that O'Leary would "irrevocably retire from her employment" with the DOE on July 1, 2002.  (Def. Ex. O'Leary P ¶ 1)  O'Leary, in fact, retired on that date (Def. Ex. O'Leary P ¶ 1; Resp. to 56.1 ¶ 318) and filed her EEOC charge on August 29, 2002 (Def. Ex. O'Leary A at 1; Resp. to 56.1 ¶ 319).

   1.  Discrimination

In moving for summary judgment, defendants argue that the ADEA statute of limitations bars any portion of plaintiff O'Leary's claim that arose before November 2, 2001, which was 300 days before she filed her EEOC charge on August 29, 2002.  (Def. Mem. at 32-33)  There is no evidence in the record from which a reasonable jury could find the existence of a continuing practice or policy of any defendant.  Those assertedly adverse employment actions that arose before November 2, 2001 are time-barred.

Here, the institution of disciplinary charges was within the limitations period, as was the agreement to settle the charges through an agreement to retire.  However, the initial transfer to the district office and the subsequent transfer twelve days later to the CSE were both outside the 300-day limitations period.  Nevertheless, I will consider whether these transfers – had they not been time-barred – amounted to adverse employment actions, and I will consider plaintiff O'Leary's assertion that the retirement decision, which occurred within the limitations period, amounted to a constructive discharge.  Plaintiff O'Leary argues that she was

constructively discharged because the only other option available to her was to contest the disciplinary charges, which plaintiffs contend were groundless.  (Pl. Mem. at 38-39)

Under state law, plaintiff O'Leary could have demanded a hearing before a neutral arbitrator to challenge the charges:

> [At the arbitration hearing, the] employee shall have a reasonable opportunity to defend himself or herself and an opportunity to testify in his or her own behalf. The employee shall not be required to testify.  Each party shall have the right to be represented by counsel, to subpoena witnesses, and to cross-examine witnesses.

NY CLS Educ. § 3020-a(c)(i).  Faced with similar charges, other plaintiffs in this litigation have pursued their arbitration rights.  See, e.g., Def. Exs. Weber-Wolf X, Y, Z; Resp to 56.1 ¶¶ 281-83.  Instead of doing so, O'Leary met with her attorney several times and negotiated the agreement with defendant DOE settling the disciplinary charges.  (O'Leary Dep. at 232, 236, 244)

The initiation of disciplinary proceedings alone does not constitute an adverse employment action if it has not resulted in any "materially adverse change in the terms or conditions of employment."  Fairbrother, 412 F.3d at 56.  Although plaintiff O'Leary was reassigned to the district office while these proceedings were pending (O'Leary Dep. at 18), she also testified that this change did not affect her salary in any way (Id. at 218)  In their memorandum, plaintiffs assert that "[g]enerally, when teachers are sent to these administrative offices pending investigations[,] they are either sitting around doing nothing or asked to perform menial clerical tasks."  (Pl. Mem. at 39)  Plaintiffs cite no evidence in support of this general assertion or its application to O'Leary.  On the contrary, O'Leary testified that she spent, at most, twelve days in the district office before her reassignment to the CSE, a division of defendant DOE that apparently utilized her expertise in special education, albeit in a different capacity than at P.S. 104.  (O'Leary Dep. at 18, 230)  Therefore, as with plaintiff Silverstein's discrimination claim based upon her transfer, no reasonable jury could find that O'Leary's reassignment

resulted in a "real change in the conditions of employment." Fairbrother, 412 F.3d at 56 (affirming summary judgment to employer because, in the absence of such a change, a transfer is "only a mere inconvenience or an alteration of job responsibilities, and hence not materially adverse"). See also Ticali, 41 F.Supp.2d at 265 (granting summary judgment to employer because employee produced "no material evidence that her transfer [from teaching first grade to pre-kindergarten] obliged her to perform tasks that were less appropriate for her skills than her prior position or adverse to her in any other legally cognizable way"). Unlike in Rodriguez, 620 F.3d at 362, O'Leary's change in job responsibilities was not "profoundly different" and did not render useless her experience as a teacher of special education.

As to the specific claim that plaintiff O'Leary was constructively discharged, no reasonable jury could find that the mere fact that defendant DOE had accused O'Leary of incompetence, insubordination, conduct unbecoming and neglect of duty (Def. Ex. O'Leary O) created a "work atmosphere so intolerable that [she has] forced to quit involuntarily." Terry, 336 F.3d at 151-52. Several courts have held that an employee is not constructively discharged when he or she resigns rather than respond to disciplinary charges. See, e.g., Silverman, 216 F.Supp.2d at 115-16; Stembridge, 88 F.Supp.2d at 284-85. In opposing defendants' motion for summary judgment, plaintiffs have failed to come forward with any evidence from which a reasonable jury could conclude that O'Leary was constructively discharged, and therefore her claim of age discrimination fails.

Summary judgment is granted to defendants as to plaintiff O'Leary's claim of age discrimination.


2. Retaliation

It is undisputed that plaintiff O'Leary retired from her job with defendant DOE on July 1, 2002, nearly two months before filing her EEOC charge on August 29, 2002. (Def. Exs.

86

O'Leary A at 1, P ¶ 1; Resp. to 56.1 ¶¶ 318-19)  There is no evidence in the record as to what, if any, interactions existed between O'Leary and the DOE after her retirement.  O'Leary testified that her retaliation claim was based upon an insubordination charge that resulted from her signing the March 2002 agreement.  (O'Leary Dep. at 254-55)  O'Leary also testified that, since filing her EEOC charge, she has "applied for numerous jobs at the Board of Education, and [she has] received no response."  (O'Leary Dep. at 267)  However, there is no evidence in the record as to the positions for which O'Leary submitted applications, whether she was actually qualified for such positions and whether the alleged rejections of her applications occurred under circumstances giving rise to an inference of age discrimination.  As a result, no reasonable jury could conclude, based on the available evidence, that the DOE engaged in any employer conduct that could be considered materially adverse to O'Leary, even under the standard articulated in Burlington Northern, 126 S. C. at 2415-16.  Therefore, summary judgment is granted to defendants on O'Leary's claim of retaliation under the ADEA.

### K.  Debora Mauskopf

Plaintiff Debora Mauskopf was born in 1952.  (Def. Ex. Mauskopf A; Resp. to 56.1 ¶ 320)  Mauskopf had been working as a tenured teacher at P.S. 163 until at least June 1997, but she did not return to work in September 1997.  (Def. Exs. Mauskopf S, T; Resp. to 56.1 ¶¶ 340-42)  On October 20, 1997, Mauskopf applied for a Restoration of Health Sabbatical.  (Def. Exs. Mauskopf U; Resp. to 56.1 ¶ 343)  In her application, Mauskopf requested that the sabbatical run from September 19, 1997 to January 31, 1998.  (Id.)  Mauskopf testified that, on December 8, 1997, defendant Patrick Marano – the Principal of P.S. 163 – contacted her and informed her that her sabbatical application had been denied.  (Mauskopf Dep. at 44; Resp. to 56.1 ¶ 344)  Defendants assert that Marano also sent Mauskopf a letter to this effect (Def. Ex. Mauskopf W), but Mauskopf testified that she did not receive it.  (Mauskopf Dep. at 46)

On September 7, 1999, defendant DOE deemed plaintiff Mauskopf to have resigned due to the abandonment of her position.  (Def. Ex. Mauskopf B)  Mauskopf testified that defendant DOE did not inform her of this fact, and indeed she requested leaves of absence before and after this date.  (Mauskopf Dep. at 78; Pl. Ex. NNN)  In December 2001, Mauskopf contacted a representative of her union regarding her requests for leave and her appeal of an unsatisfactory rating she had received for the 1996-1997 school year.  (Mauskopf Dep. at 109; Resp. to 56.1 ¶¶ 338, 347)  The union representative informed Mauskopf that the DOE considered her to be on unauthorized leave.  (Mauskopf Dep. at 109)  A different union representative later informed Mauskopf that this meant that she had no valid basis to assert the right to work in the school to which she had been last assigned.  (Mauskopf Dep. at 120; Def. Ex. Mauskopf Z)

On March 20, 2002, defendant DOE held a hearing with respect to plaintiff Mauskopf's unsatisfactory rating for the 1996-1997 school year.  (Def. Ex. Mauskopf Y; Resp. to 56.1 ¶ 348)  On April 17, 2002, the DOE denied Mauskopf's appeal of the rating.  (Def. Ex. Mauskopf Y; Resp. to 56.1 ¶ 348)

On June 3, 2002, plaintiff Mauskopf sent defendant Marano a letter in which she indicated that she was ready to return to work on September 1, 2002.  (Def. Ex. Mauskopf AA; Resp. to 56.1 ¶ 351)  Marano contacted a personnel director for the DOE about the letter, who told Marano that Mauskopf could not return to P.S. 163 because she had abandoned her position. (Def. Ex. Mauskopf BB; Resp. to 56.1 ¶ 352)  In late June 2002, Marano's union representative informed her that she was no longer an employee of the DOE.  (Mauskopf Dep. at 123-24)  On August 29, 2002 – over five years after she last taught a class for the DOE, Mauskopf filed her EEOC charge alleging age discrimination.  (Def. Ex. Mauskopf DD; Resp. to 56.1 ¶ 355)

1.  <u>Discrimination</u>

I addressed plaintiff Mauskopf's claim of age discrimination based upon her discharge from employment in my earlier opinion in this case.  <u>Carmellino</u>, 2004 WL 736988, at *15-*18.  Specifically, I concluded that the continuing violation doctrine does not apply to Mauskopf's claims and that those portions of her claim arising before November 2, 2001 are barred by the ADEA statute of limitations.  <u>Id.</u> at *15-*17.  However, I also concluded – based upon the facts in the record and viewed in a light most favorable to the non-movants – that Mauskopf was informed of her discharge from employment with defendant DOE in June 2002, within the 300-day statute of limitations.  <u>Id.</u> at *17.

In moving for summary judgment, defendants argue, for a second time, that the ADEA statute of limitations bars any claim asserted by plaintiff Mauskopf that she was wrongfully discharged because, in defendants' view, such discharge should be deemed to have occurred long before June 2002.  (Def. Mem. at 23-34)  Although defendants' memorandum does not specify the precise date on which they contend Mauskopf's discharge should be considered by this Court to have occurred, it does not matter for purposes of their motion.  As noted in my prior opinion, the statute of limitations for a wrongful discharge claim "begins to run on the date that the employer gives definite notice of the discharge decision to the employee . . . ."  <u>Carmellino</u>, 2004 WL 736988, at *15 (citing <u>Chardon v. Fernandez</u>, 454 U.S. 6, 8 (1981)).

Despite having had the opportunity for further discovery, defendants have failed to come forward with any evidence that defendant DOE communicated the fact of termination to plaintiff Mauskopf at any point prior to June 2002.  Instead, defendants simply argue that it is "absurd" for plaintiff to have assumed that she was not terminated after having failed to show up for work or contact anyone at her school about her job status for nearly five years.  (Def. Mem. at 23)  Absurd or not, defendants have offered no evidence to dispute plaintiff's version of the facts – i.e., that she did not know that she had been discharged.  Whether Mauskopf's version is

credible is not appropriately resolved on a motion for summary judgment.  See Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").  Therefore, I abide by my earlier decision that the statute of limitations does not bar Mauskopf's claim of wrongful discharge under the ADEA.

Defendants also move for summary judgment on plaintiff Mauskopf's discrimination claim on the ground that plaintiffs have come forward with no evidence from which a reasonable jury could infer discriminatory animus.  (Def. Mem. at 24)  In response, plaintiffs argue that a reasonable jury could infer discrimination based on the fact that Mauskopf was not informed until June 2002 that she had been terminated.  (Pl. Mem at 36-37)  No reasonable jury could find that defendants harbored bias or prejudice against her based upon her age solely due to defendants' failure to inform Mauskopf of her job status.  Based upon the evidence in the record, such a conclusion would be premised upon speculation and conjecture.  "[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."  Kulak, 88 F.3d at 71 (citing Matsushita Elec. Indus. Co., 475 U.S. at 587).  Despite having the opportunity to supplement their submissions in opposing defendants' motion, plaintiffs have failed to come forward with any evidence of age-related bias on the part of any defendant.

Summary judgment is granted in favor of defendants on plaintiff Mauskopf's claim of age discrimination.


2.   Retaliation

Defendants move for summary judgment on plaintiff Mauskopf's retaliation claim on the grounds that there is no evidence that she suffered any adverse employment action after filing her EEOC charge.  (Def. Mem. at 24)  There is evidence in the record pertaining to

Mauskopf's relationship with defendant DOE after she filed her charge, but it does not support an actionable claim of retaliation. On April 10, 2003, the DOE heard and denied a second appeal regarding Mauskopf's unsatisfactory rating for the 1996-1997 school year. (Def. Ex. Mauskopf EE; Resp. to 56.1 ¶¶ 357-58) I have already concluded that such a rating, without any accompanying evidence of negative consequences, is not adverse employer conduct actionable in the context of an ADEA retaliation claim, even under the standard articulated in <u>Burlington Northern</u>, 126 S. Ct. at 2405. For the same reasons, the denial of an appeal of such a rating cannot satisfy this standard.

Summary judgment is granted to defendants on plaintiff Mauskopf's claim of retaliation under the ADEA.

### L. <u>Marian Carmellino</u>

Plaintiff Marian Carmellino was born in 1954. (Def. Ex. Carmellino A; Resp. to 56.1 ¶ 359) During the limitations period, Carmellino worked as a substitute teacher on twelve occasions in 2002. (Def. Ex. Carmellino E; Resp. to 56.1 ¶ 372) Carmellino filed her EEOC charge on September 18, 2002. (Def. Ex. Carmellino A at 1; Resp. to 56.1 ¶ 373) During the summer of 2003, Carmellino submitted an online employment application with defendant DOE. (Def. Ex. Carmellino F; Resp. to 56.1 ¶ 374)

### 1. <u>Discrimination</u>

In moving for summary judgment, defendants argue that the ADEA statute of limitations bars any portion of plaintiff Carmellino's claim that arose before November 28, 2001. (Def. Mem. at 39) Plaintiffs have failed to come forward with any evidence from which a reasonable jury could conclude that conduct of any of the defendants constituted a continuing practice. As a result, I will consider only those portions of her claim that arose after November

28, 2001.  Nevertheless, events prior to November 28, 2001 may be relevant "background

evidence".  See Jute, 420 F.3d at 176-77.

        Defendants move for summary judgment on the ground that plaintiff has failed to

come forward with evidence that she suffered adverse employment action during the relevant

period (Def. Mem. at 39) and on the ground that there is no evidence that defendants' legitimate,

nondiscriminatory reasons for any relevant conduct were pretext (Def. 7/14/06 Supp. Mem. at 9-

10).  In opposing defendants' motion, plaintiffs appear to characterize her claim as an alleged

failure to hire.  (Pl. Mem. at 41)  The documentary evidence indicates that plaintiff Carmellino

applied on two dates: September 21, 2001, which is outside the limitations period, and an

unspecified date during the summer of 2003, which is within the limitations period.  (Def. Exs.

Carmellino D, F; Resp. to 56.1 ¶¶ 370-71, 374)  Plaintiff Carmellino also testified that she

applied for a full-time reading teacher position in District 20 in 2002.  (Carmellino Dep. at 110)

There is no evidence in the record in support of the claimed 2002 application other than

Carmellino's testimony.  However, I will assume, for purposes of defendants' motion, that

plaintiffs have come forward with evidence from which a reasonable jury could find that there is

a prima facie case of age discrimination against Carmellino in connection with the failure to hire

in 2002 and 2003.

        As to the claimed 2002 application for a full-time reading position, defendants

have come forward with evidence of a legitimate, nondiscriminatory reason for not hiring

plaintiff Carmellino – specifically, other candidates who were hired had full-time teaching

experience and Carmellino had none.  Andrea Maffeo, the current Principal of P.S. 200, worked

as the Director of Literacy for District 20 of defendant DOE from 1998 to 2003.  (Id. ¶¶ 1-2)  In

this position, Maffeo interviewed and hired teachers for vacant reading teacher positions in

District 20.  (Id. ¶ 4)  In her sworn declaration, Maffeo stated:

> . . . In selecting teachers for these position[s], I preferred candidates with at least three to five years of prior full time teaching experience.  Although I do not recall selecting a candidate with less than three years of prior full time teaching experience, I am certain that every teacher selected for reading teacher positions in [District] 20, between 1998 through 2003, had at least one year of full time teaching experience.

(Id. ¶ 4)  Defendants have met their burden of production of a legitimate, nondiscriminatory reason for DOE's hiring decision.

In addition, defendants have come forward with evidence of a legitimate, nondiscriminatory reasons for the decision not to hire plaintiff Carmellino in the summer of 2003.  Carmellino, who lived in Westchester County, does not dispute that, on the application form, she ranked the Borough of the Bronx as her top choice for a teaching assignment and the Borough of Brooklyn as her second choice.  (Def. Ex. Carmellino F; Resp. to 56.1 ¶ 374)  Given the size of the workforce of defendant DOE, it is reasonable for such an employer to require job applicants to state their preferences for job locations.  Furthermore, it is equally reasonable for District 20 of the DOE, in turn, to give a higher priority to those applicants who ranked Brooklyn as their top choice.  Defendants have met their burden of producing evidence of a legitimate, nondiscriminatory reason for failing to hire Carmellino after she applied during the summer of 2003.

In response to defendants' evidence, plaintiffs have failed to come forward with any evidence that defendants' reason was pretextual.  Despite a full and fair opportunity to conduct discovery, there is no evidence in the record of any other job applicant who had applied for a full-time teaching position with defendant DOE, ranked Brooklyn as their second-choice, but was actually hired.  Instead, plaintiff has only her own testimony:

> I really have to feel that it is more age related than anything else, because it is the only factor.  I mean, are you telling me that 30 plus principals wouldn't hire someone who finished first in their class, not once, but twice, if it were up to them[?] . . . What other reason could there possibly be?  I have every credential.

(Carmellino Dep. at 127)  A plaintiff's subjective and conclusory belief that she is the most qualified candidate for a job is insufficient to demonstrate that an employer's legitimate, nondiscriminatory reason was pretextual.  See Holt v. KMI-Cont'l, 95 F.3d 123, 130 (2d Cir. 1996), cert. denied, 520 U.S. 1228 (1997) (affirming a grant of summary judgment).

Summary judgment is granted to defendants as to plaintiff Carmellino's claim of age discrimination.

2.  Retaliation

It is undisputed that laintiff Carmellino filed her EEOC charge on September 18, 2002.  (Def. Ex. Carmellino A at 1; Resp. to 56.1 ¶ 373)  After that date, the only evidence in the record is that Carmellino submitted an online employment application with defendant DOE during the summer of 2003, which did not result in her being hired.  (Def. Ex. Carmellino F; Resp. to 56.1 ¶ 374)

Plaintiffs have come forward with no evidence that this failure to hire was causally connected to her EEOC charge.  There is simply no evidence in the record that any person involved in the decision not to hire Carmellino after she applied online did so with any knowledge of her EEOC charge.  Indeed, Carmellino testified that she had applied for full-time teaching positions several times from 1998 to present (Carmellino Dep. at 21, 24, 29, 46, 71, 75), although documentary evidence in the record only exists as to the occasions in 2001 and 2003 discussed above.  However, if Carmellino is correct that she had applied multiple times prior to September 2002, then defendant DOE repeatedly had decided against hiring Carmellino on a full-time basis – each prior to her engaging in protected activity.  Therefore, it is not surprising that the DOE would decide not to do so again in the summer of 2003, regardless whether plaintiff had filed a charge with the EEOC.  Despite having a full opportunity to conduct discovery and an opportunity to supplement their submissions in opposing defendants' motion,

plaintiffs have failed to offer any additional evidence to raise a triable issue of fact on this claim. The decision not to hire Carmellino in the summer of 2003 was made at least nine months after she filed her charge, a gap in time that is too long – without more – for a reasonable jury to infer a causal relationship.  See generally Clark County Sch. Dist., 532 U.S. at 273 (collecting cases in which three and four-month periods between the protected activity and the adverse action were insufficient to establish a causal connection).  Finally, in her deposition, Carmellino testified that she did not think that any of the defendants retaliated against her.  (Carmellino Dep. at 134)

Summary judgment is granted to defendants as to plaintiff Carmellino's claim of retaliation under the ADEA.

IV. False Arrest and Abuse of Process Claims of Victor Sands

A. Facts

From 1985 to June 2001, plaintiff Victor Sands taught at I.S. 220K.  (Resp. to 56.1 ¶ 19)  On May 4, 2001, plaintiff Sands submitted his application for retirement, which would become effective on July 1, 2001.  (Sands Dep. at 12; Def. Ex. Sands A)

In September 2001, plaintiff Sands anonymously sent defendant Jo Rossicone – the principal of I.S. 220K – a newspaper article discussing the present lawsuit pending before me.  (Sands Dep. at 7; Def. Ex. Sands C)  Sands attached a note to the article that stated, "You're next sweet cheeks."  (Def. Ex. Sands D; Resp. to 56.1 ¶ 22)  In his deposition, Sands testified that his intent, in sending the article and note, "was to be the first one to make her aware of some bad news coming her way."  (Sands Dep. at 15)  In addition, Sands testified, "this was [his] little way to spoil her day."  (Sands Dep. at 16)

Defendant Rossicone testified that she felt "shocked" and "threatened" when she received the anonymous note, and she called the police.  (Rossicone Dep. at 168-69)  On September 17, 2002, Detective John Ryan interviewed Rossicone about the matter.  (Ryan Dep.

at 12)  Rossicone speculated that plaintiff Sands had written the note because she recognized his handwriting.  (Ryan Dep. at 14)  After comparing handwriting samples of Sands, Ryan agreed that they were similar to the handwriting on the note.  (Ryan Dep. at 15)

On October 26, 2002, Detective Ryan went to plaintiff Sands' residence, presented Sands with the article and attached note, and asked Sands whether he sent the items to defendant Rossicone.  (Ryan Dep. at 45-46)  Sands admitted that he had done so.  (Sands Dep. at 33)  Ryan then scheduled an appointment for October 30, 2002 with Sands for further investigation of the matter.  (Ryan Dep. at 47-48)  However, Sands did not appear for the appointment.  (Ryan Dep. at 48)

On October 31, 2002, Detective Ryan was contacted by plaintiff Sands' attorney. (Ryan Dep. at 48)  Sands' attorney asked Ryan to close the investigation because the correspondence sent to defendant Rossicone represented Sands' opinion.  (Ryan Dep. at 48) Ryan then contacted the Legal Bureau of the New York Police Department as well as the Office of the Kings County District Attorney ("DA") to determine whether this matter should be prosecuted.  (Ryan Dep. at 49)  On November 6, 2002, the DA's Office advised Ryan that Sands' actions rose to the level of a crime and that the matter could be prosecuted.  (Ryan Dep. at 51)

On January 17, 2003, Detective Ryan contacted plaintiff Sands' attorney to arrange a meeting with Sands.  (Ryan Dep. at 53)  On February 11, 2003, Sands met with Ryan at the police station.  (Ryan Dep. at 54)  On that date, Sands was issued a Desk Appearance Ticket ("DAT"), which directed Sands to appear in Kings County Criminal Court on March 17, 2003.  (Def. Ex. Sands H; Resp. to 56.1 ¶ 34)  On March 5, 2003, the DA's Office declined to prosecute the matter.  (Def. Ex. Sands I; Resp. to 56.1 ¶ 35)

B. <u>Discussion</u>

Plaintiff Sands asserts two claims against defendants Rossicone, Grippo, District 20, and DOE under 42 U.S.C. § 1983. (Compl. ¶ 492) First, Sands alleges that Rossicone induced Detective Ryan to arrest him and thus is liable for false arrest. (Compl. ¶ 492) Second, Sands alleges that the "conduct and actions of . . . Rossicone[,] in causing charges to be filed against [him,] even though she knew he had committed no crime" were an abuse of process. (Compl. ¶ 487) Sands argues that the other defendants should be liable for the actions of Rossicone because she acted in her official capacity as principal of I.S. 220K. (Compl. ¶¶ 487, 492)

"Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." <u>Jocks v. Tavernier</u>, 316 F.3d 128, 134 (2d Cir. 2003). "Under New York state law, to prevail on a claim of false arrest a plaintiff must show that '(1) the defendant intended to confine him; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged.'" <u>Id.</u> at 134-35 (quoting <u>Broughton v. State</u>, 37 N.Y.2d 451, 456 (1975), <u>cert. denied sub nom. Schanbarger v. Kellogg</u>, 423 U.S. 929 (1975)). It is "well established that the existence of probable cause is an absolute defense to a false arrest claim . . . ." <u>Caldarola v. Calabrese</u>, 298 F.3d 156, 161 (2d Cir. 2002) (applying New York law). <u>See also Weyant v. Okst</u>, 101 F.3d 845, 852 (2d Cir. 1996) (noting that this "privilege" to arrest applies regardless "whether that action is brought under state law or under Section 1983"). "[T]he issue of probable cause is a question of law to be decided by the court only where there is no real dispute as to the facts or the proper inferences to be drawn from such facts." <u>Parkin v. Cornell Univ., Inc.</u>, 78 N.Y.2d 523, 529 (1991) (citing <u>Veras v. Truth Verification Corp.</u>, 87 AD2d 381, 384 (1st Dep't 1982), <u>aff'd</u> 57 N.Y.2d 947 (1982)).

"For false imprisonment liability to attach to one who causes or directs an arrest or imprisonment in New York, 'the defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal to the point where the officer is not acting of his own volition.'" Curley v. AMR Corp., 153 F.3d 5, 13-14 (2d Cir. 1998) (quoting 59 N.Y.Jur.2d False Imprisonment § 37 (1987)).  However, "[a] civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest or malicious prosecution." Levy v. Grandone, 14 A.D.3d 660, 661 (2d Dep't 2005), lv. to appeal denied, 5 N.Y.3d 746 (2005).

Plaintiffs have failed to come forward with any evidence that defendant Rossicone acted with any "undue zeal to the point where the officer [was] not acting of his own volition." Curley, 153 F.3d at 13-14.  The only evidence plaintiffs offer regarding Rossicone's influence over this matter is a single statement by Detective Ryan in his deposition.  After receiving a lukewarm response from the NYPD Legal Bureau and the DA's Office about the criminality of plaintiff Sands' conduct, Ryan contacted Rossicone to inquire whether "she still wanted to pursue this."  (Ryan Dep. at 52)  Ryan testified in his deposition that Rossicone responded that she did, and Ryan then later issued a DAT to Sands.  (Id. at 52; Def. Ex. Sands H)  Plaintiffs have had a full and fair opportunity to conduct discovery.  The fact that Rossicone responded affirmatively to Ryan's inquiry as to whether she wished to pursue the matter cannot reasonably be interpreted as "undue zeal" or active participation in bringing about Sands' arrest.  No reasonable jury could conclude, based on the evidence in the record, that Ryan did not act of his own volition in deciding to issue a DAT to Sands.

A claim of abuse of criminal process brought under section 1983 must be analyzed under state law.  Cook v. Sheldon, 41 F.3d 73, 79-80 (2d Cir. 1994).  The New York

Court of Appeals has articulated three elements of an abuse of process claim: "(1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective." Curiano v. Suozzi, 63 N.Y.2d 113, 116 (1984). In addition, "the process used must involve 'an unlawful interference with one's person or property.'" Id. (quoting Williams v. Williams, 23 N.Y.2d 592, 596 (1969)). In applying these requirements, the Court of Appeals held that merely filing and serving a summons does not constitute such an interference. Id. "[T]he 'gist of the action for abuse of process' . . . is 'the improper use of process after it is issued.'" Id. at 117 (quoting Williams, 23 N.Y.2d at 596). A viable claim must offer evidence of such improper use, and a "malicious motive alone . . . does not give rise to a cause of action for abuse of process." Id.

Here, plaintiff Sands received a DAT from Detective Ryan on February 11, 2003. (Ryan Dep. at 54) It is undisputed that the DAT directed him to appear in criminal court. (Def. Ex. Sands H; Resp. to 56.1 ¶ 34) On March 5, 2003, the DA's Office declined to prosecute the matter. (Def. Ex. Sands I; Resp. to 56.1 ¶ 35) There is no evidence in the record as to anything else that occurred before this date, let alone any evidence to support a finding that the issuance of this DAT resulted in any improper interference with plaintiff Sands' person or property. See Curiano, 63 N.Y.2d at 116. Based upon the evidence in the record, no reasonable jury could find that plaintiff Sands experienced anything more than the bare initiation of a criminal prosecution predicated on his admission that he had anonymously sent defendant Rossicone what could reasonably be considered a threatening note. Lacking evidence that the conduct of defendant Rossicone or any other defendant reflected "an intent to do harm without excuse or justification" or used criminal process "in a perverted manner to obtain a collateral objective," id., plaintiff Sands has no evidence to support a claim of abuse of process.

As to plaintiff Sands' claims of false arrest and abuse of process, summary judgment is granted in favor of defendants.

V.     Conclusion

        Defendants' motion for summary judgment is denied as to plaintiff Melendi's

claims of discrimination and retaliation and is otherwise granted.

                SO ORDERED.

                                                    _____
                                                         P. Kevin Castel
                                                    United States District Judge

Dated:  New York, New York
        September 6, 2006

                                        100